IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

LUCILLE BECK, an individual,                        Case No. 3:13-cv-00879-AC

               Plaintiff                        OPINION AND ORDER

      v.

METROPOLITAN PROPERTY AND
CASUALTY INSURANCE COMPANY,
a corporation,

             Defendant.

_____

ACOSTA, Magistrate Judge:

*Introduction*

    Lucille Beck ("Beck") and Metropolitan Property and Casualty Insurance Company

("Metropolitan") disagree over the amount Metropolitan must pay Beck pursuant to her insurance

policy for the loss of her home from a 2011 fire. After attempts to reach agreement on an amount

to be paid failed, Beck sued Metropolitan to recover the actual cash value ("ACV") of her home in

accordance with the policy's coverage. Beck does not allege bad faith against Metropolitan, and

Metropolitan does not contend Beck's loss is not covered under her policy. The sole dispute in this

OPINION AND ORDER - 1                                                [RMD]

case is how much money Metropolitan must pay Beck under the insurance contract for the loss of her home.

The parties' instant dispute arises from Metropolitan's motion to amend its answer to add seven new affirmative defenses. The seven proposed defenses are based on Metropolitan's theory that in August 2012 the parties settled all or part of their dispute over the amount Beck should receive for the loss to her home. Beck opposes Metropolitan's motion. Because Metropolitan unduly delayed raising the proposed defenses and seeks to add defenses which are futile, and because Beck would be unduly prejudiced at this point if Metropolitan is allowed to add the new defenses, Metropolitan's motion to amend is denied.

*Factual Background*

In December 2011, a fire occurred at and destroyed Beck's home. The day after the fire, Beck filed a claim for loss with Metropolitan, her insurer. On January 4, 2012, Beck asked her long-time attorney, Clarence Greenwood ("Greenwood"), to negotiate a resolution of her claim. (April 14, 2014, Declaration of Clarence Greenwood ("First Greenwood Decl.") (Dkt. 24) at ¶ 2). Greenwood initially attempted to resolve Beck's claim with Metropolitan, which efforts resulted in Metropolitan tendering $347,786.34 on February 29, 2012, to compensate Beck for the damage to her house. (July 2, 2014, Declaration of Andrew Reilly ("First Reilly Decl.")(Dkt. No. 50) at ¶ 5.) Beck rejected that amount as sufficient to resolve her claim.

On March 2, 2012, Andrew Reilly ("Reilly"), one of Greenwood's law partners, retained the services of general contractor Harry Shook ("Shook"), of Partners, Inc., to prepare estimates on the scope and expense of the repairs necessary to rebuild Beck's home. Specifically, Reilly retained Shook "to assist us with the preparation and presentation of Ms. Beck's fire loss claim at her

OPINION AND ORDER - 2                                              [RMD]

residence[.]" (March 2, 2012, letter of Andrew Reilly to Harry Shook ("Reilly Letter") at 1.) Ultimately, on March 27, 2012, Shook estimated the cost to repair Beck's home at $565,327.00. (Declaration of Spencer Funk ("Funk Decl.") (Dkt. No. 37) at ¶ 3.)

Metropolitan assigned one of its adjusters, Spencer Funk ("Funk"), to prepare a separate estimate of Beck's loss. Metropolitan also hired Andy McCabe ("McCabe") of McBride Construction to assist Funk in that effort. At the end of March 2012, Funk inspected Beck's house and estimated the cost to repair Beck's house at $428,000.00. (Funk Decl. at ¶ 2.) McCabe, however, prepared a scope of repairs that estimated the cost at $520,144.44. (First Reilly Decl. at ¶ 5.)

On August 28 and 29, 2012, Shook, Funk, and McCabe met at Beck's damaged home to review and discuss the estimates. (Funk Decl. at ¶ 5.) In preparation for the meeting, Reilly emailed Funk to explain that Shook was being made available "to have a 'sit down' to discuss his scope and bid." (July 23, 2014, Declaration of Andrew Reilly ("Second Reilly Decl.")(Dkt. No. 68), Ex 1 at 2.) At the two-day meeting, Funk, McCabe, and Shook did a room-by-room review of the house and attempted to negotiate changes to Shook's estimate. (Funk Decl. at ¶ 5.) On the afternoon of August 29, Greenwood and Beck arrived at the property to review the progress Shook and Funk had made. (Funk Decl. at ¶ 6.) According to Funk, Greenwood was "impatient about arriving at a final estimate expense number," but Funk explained that he, McCabe, and Shook had just finished reviewing the scope of repairs and still needed to revise 300 line-items before the estimate was finalized. (Funk Decl. at ¶ 6.) Funk agreed to assist Shook by making the agreed-upon changes to the Shook estimate. Funk revised the estimate and sent it to Shook who, upon receiving the new estimate, called Funk to advise that Shook "planned to meet with more general contractors to inspect the site

and review the estimate . . . prior to his meeting with Mr. Greenwood on September 12, 2012."
(Funk Decl. at ¶ 8.)

In a September 18, 2012, email to Funk, Greenwood acknowledged his receipt of the new
estimate and requested a written synopsis of changes Funk and Shook made to the estimate, which
Greenwood referred to as a "redline document." (July 23, 2014, Declaration of Clarence Greenwood
("Second Greenwood Decl.") (Dkt. No. 67), Ex. 1 at 4-5.) Greenwood explained that, in its non-
annotated form, the estimate "leaves [him] to either hunt and peck through two documents (or more)
to discern what the suggested negotiated changes [Metropolitan] is requesting . . . or prepare [his]
own redline of the [Metropolitan] requested changes" before he could advise Beck. (Second
Greenwood Decl., Ex. 1 at 5.) According to Greenwood, the redline document was indispensable
because "to settle the home loss [he] need[ed] to understand the changes [Metropolitan] is proposing
and go over the changes with the owner of the home." (Second Greenwood Decl., Ex. 1 at 5.)
Greenwood concluded by noting that he "would like to continue the negotiation and settlement
process with the agreement in place that if settlement does not result, anything said or done in this
negotiation process will not be used as evidence by either party later on in the process." (Second
Greenwood Decl., Ex. 1 at 5.)

Funk replied via a letter sent September 21, 2012, in which he explains that he and Shook
"agreed on each and every line item," but disagreed about "the interpretation of the results." (Second
Greenwood Decl., Ex. 1 at 1.) Funk stated that he, McCabe, and Shook all agreed on an estimate
of $434,041.62, but Shook no longer had permission to talk with him about the estimate and, "short
of some compelling argument to the contrary," he considered his role in the negotiations concluded.
(Second Greenwood Decl., Ex.1 at 2.) Finally, Funk warned Greenwood that Beck had "a duty to

secure an agreed figure per the estimate **prior** to initiating" construction to restore her home. (Second Greenwood Decl., Ex.1 at 2) (emphasis original.)

Greenwood emailed Funk on September 28, 2012, after receiving and reviewing Funk's September 21 letter. (Second Greenwood Decl., Ex. 2 at 1.) In Greenwood's email, he confirmed that the parties "are still in the process of negotiating a settlement of the home fire loss . . . ." (Second Greenwood Decl., Ex.2 at 1.) He also renewed his request for Funk to rewrite the estimate in "redlined format" which would succinctly explain the changes made to the nearly 300 revised line-items. (Second Greenwood Decl., Ex.2 at 1.)

In anticipation of an October 19, 2012, conference call between Funk, Greenwood, Shook, Beck, and one of Beck's sons, Greenwood sent Funk a letter on October 18 "as a continuation of the efforts to negotiate and settle the fire loss damage to the home." (Second Greenwood Decl., Ex.3 at 1.) Greenwood outlined areas of disagreement that he and Beck had with the revised estimate. Notably, the parties differed in the cost of: (1) masonry, steel components, and the fireplace; (2) insulation; (3) light fixtures; (4) permitting fees; (5) finish carpentry; and (7) labor. (Second Greenwood Decl., Ex.3 at 2-3.) Greenwood also outlined the following "open items" for which he reserved Beck's right to request reimbursement:

> (a) The floors on the second floor remain open on the issue of whether they need to be replaced;
>
> (b) The library walls and ceiling remain open as to the condition and repair;
>
> (c) Heat, vent, and ducting will remain open as to the type of and size of replacement furnace and costs of installation;
>
> (d) There is an open issue regarding any other conditions that may be discovered once the demolition is complete;

(e) Landscaping will remain an open item;

(f) Profit and Overhead is adjusted for the above items and the open items in a supplemental request; and

(g) Architectural/engineering costs needed to rebuild the living room once it is torn out

(Second Greenwood Decl., Ex. 3 at 4.)

During the October 19, 2012, conference call, the parties discussed additional changes to the estimate. (Funk Decl. at ¶ 15.) Ultimately, "in an effort to resolve this matter[] and appease Mr. Greenwood," Funk agreed to revise the estimate upward roughly $4,000.00 to provide for additional repairs. (Funk Decl. at ¶15.) The upward revisions yielded a new total of $438,822.50. (Funk Decl. at ¶ 17.)

Negotiations continued into 2013. (Second Greenwood Decl., Ex. 4 at 1.) In January 21, 2013, letter from Greenwood to Funk intended to "state Lu Beck's position on the settlement of this matter," Greenwood took issue with representations Funk made in previous correspondence. (Second Greenwood Decl., Ex. 4 at 1.) First, Greenwood disavowed the notion that the parties agreed on the final scope of repair as revised after the August 28 and 29 meetings. (Second Greenwood Decl., Ex. 4 at 1.) He explains that he was "informed by Shook that he never agreed to this scope because his view that the living room foundation and chimney work is essential to rebuilding the destroyed living room." (Second Greenwood Decl., Ex. 4 at 1.) Greenwood also objected to Funk's attempt to subtract a depreciation value from the estimate and purports to make one final attempt to settle the matter extra-judicially. (Second Greenwood Decl., Ex. 3 at 2-3.) He stated that he and Beck were "of the view that it is time to either settle the home loss or move it to dispute resolution," and proposed a final offer:

Ms. Beck offers to settle the home loss for $500,000, including the release MetLife requested. This offer accepts for the purpose of settlement the $438,882 number in your November 1, 2012 letter, plus an adjustment for Portland permitting fees of $9,000 . . . and the repairs to the chimney and foundation ($17,274). In addition, it includes a $34,844 contingency amount for the open items. . . . Finally, the offer relies on [Metropolitan's] August 29, 2012 statement that no depreciation will be applied.

(Second Greenwood Decl., Ex. 4 at 3.) Greenwood concludes by declaring that his offer will be good through the close of business on January 29, 2013. (Second Greenwood Decl., Ex. 4 at 3.)

On February 3, 2013, after Greenwood's offer had expired, Metropolitan's attorney Dan Thenell ("Thenell") sent Greenwood a letter explaining that all future communications on the issue should be addressed to him. (Second Greenwood Decl., Ex. 5 at 1.) The letter recounts the facts and communications which occurred to that point and attempts to address "factual inaccuracies" contained in Greenwood's January 21, 2013, letter. (Second Greenwood Decl., Ex. 5 at 2.) After stating his position on the facts of the case, Thenell writes, "[i]f the present claim valuation is now going to be disputed further, please be advised that [Metropolitan] reserves the right to withdraw any and all offers, estimates, and discussions of settlement to date." (Second Greenwood Decl., Ex. 5 at 3.) In his letter, Thenell made no reference to the parties having settled Beck's claim or any part of it, nor did he assert that the August 2012 meeting between Funk and Shook resolved in binding fashion some or all of the disputed items contained in the scope-of-repairs document.

In May 2013, Beck filed suit alleging breach of contract after the parties could not settle the dispute extra-judicially. (Dkt. No. 1.) In its answer, Metropolitan asserted four affirmative defenses, including: (1) Failure to comply with contractual obligations; (2) "No Breach;" (3) "Facts insufficient;" and (4) Non-occurrence of a condition precedent. (Dkt. No. 8.) Metropolitan asserted no defense which relied on the theory that Beck settled her claim, or any part or component of it.

OPINION AND ORDER - 7                                                    [RMD]

Metropolitan now asserts, more than a year later, the parties settled some or all of Beck's claim in August 2012, specifically, that Funk and Shook agreed to certain line-items in the scope of repairs and that their agreement is binding on the parties. To that end, Metropolitan seeks to add seven new affirmative defenses which rely on a theory Metropolitan has not previously asserted: that Shook had actual or apparent authority to bind Beck, which authority he exercised during his revision of the repair estimate. Shook's exercise of authority, Metropolitan argues, created a binding contract between Beck and Metropolitan which settled at least a portion of Beck's claim.

Metropolitan's new theory does not rely on new evidence or evidence that had not been previously disclosed. Instead, Metropolitan contends that Beck's lawyers have admitted Shook's status as Beck's agent by making certain statements during court hearings:

- "Mr. Shook was to conduct a joint inspection and participate in the negotiation of a potential settlement." (Def.'s Motion to Amend at 3.)

- "Mr. Shook's scope and bid were provided to Mr. Funk before this meeting, and Mr. Shook was made available for this meeting, for the express purpose of trying to settle the loss to the structure of Mrs. Beck's home." (Def.'s Motion to Amend at 3.)

- Greenwood sent Shook to meet with Funk "to try and discuss settlement." (Def.'s Motion to Amend at 4.)

- The purpose of sending Shook to meet with Funk "was to try to see where the areas of difference were, where the areas were that there was some agreement, and try and – try and settle this dispute and arrive at a settlement." (Def.'s Motion to Amend at 4.)

*Legal Standard*

Under Federal Rule of Civil Procedure 15 "a party may amend its pleadings only with the opposing party's written consent or the court's leave." The court should "free give leave when justice so requires." FED. R. CIV. P. 15(a)(2). When analyzing whether justice requires leave to

OPINION AND ORDER - 8                                                    [RMD]

amend, the court considers five factors: (1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of the amendment; and (5) whether the party previously amended their pleading. *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004).

## Discussion

Metropolitan's motion for leave to amend rests on their argument that, during negotiations between Beck and Metropolitan, Shook had actual or apparent authority to bind Beck to a settlement agreement. Beck opposes Metropolitan's motion and claims Metropolitan's motion should be denied because all five factors relevant to the court's analysis weigh against granting Metropolitan's motion.

## I. Undue Delay

Metropolitan contends that its lengthy delay in raising the new defenses was not undue because they only recently learned of facts which gave rise to their new defenses. In the Ninth Circuit, "a substantial delay on the part of the moving party, while not dispositive, is nevertheless relevant." *Axial Vector Engine Corp. v. Transporter, Inc.*, No. 05-1469-AC, 2008 WL 4547795, at *3 (D. Or. Oct. 9, 2008), *citing Lockheed Martin Corp. v. Network Solutions Inc.*, 194 F.3d 980, 986 (9th Cir. 1999) (finding a motion to amend filed after several months with no reason given for the delay supported the district court's denial of leave). "Relevant to evaluating the delay issue is whether the moving party knew or should have known the facts and theories raised by the amendment in the original pleading." *Jackson v. Bank of Haw.*, 902 F.2d 1385, 1388 (9th Cir. 1990).

Metropolitan contends the new facts discovered are statements Beck's attorney made to the court more than eighteen months after the events Metropolitan now asserts created a settlement of

OPINION AND ORDER - 9                                                    [RMD]

some or all of Beck's claim. Metropolitan observes that Beck's attorney represented to the court that Shook "participate[d] in the negotiation of a potential settlement," and the meeting between Funk and Shook was "intended to negotiate and settle . . ." the dispute. (Def.'s Mot. to Amend at 3-4.) However, at or soon after the August 2012 meeting, Metropolitan knew or should have known of all the underlying facts upon which it now bases its proposed amendments, as the record makes clear.

First, the foundation of Metropolitan's motion to amend are the discussions between Funk and Shook at the August 2012 meeting, discussions in which Metropolitan's agent fully participated and clearly had knowledge of at the time. Funk himself acknowledged in his September 21, 2012, letter that he and Shook "agreed on each and every line item," and that he, McCabe, and Shook all agreed on an estimate of $434,041.62. Thus, Metropolitan knew by September 2012 the facts upon which their settlement theory is based, yet it failed to raise affirmative defenses based on those facts until well more than one year after the Beck filed her case and barely one month before the deadline to complete discovery.

Second, the parties' correspondence between October 2012 and February 2013 make clear that Metropolitan and Beck each understood Beck's claim remained unresolved. During this period settlement negotiations were on-going between Greenwood and Funk, and then Greenwood and Thenell. The parties' respective agents exchanged offers and counter-offers on behalf of their respective clients, and at no point during these negotiations did Metropolitan assert that Shook, on behalf of Beck, had committed Beck to agreement on some or all of her claim, even though Funk believed in September 2012 that he and Shook at "agreed on each and every line item" in the scope of repairs document.

Metropolitan knew or, certainly, had reason to know, in September 2012 of the underlying

facts upon which it now bases its settlement defenses, but it failed to raise those defenses timely after Beck filed her lawsuit in May 2013. This undue delay warrants denying Metropolitan's motion to amend.[1]

## II. Futility

Beck argues that Metropolitan's proposed amendments are futile because they cannot prove that an agency relationship existed between Beck and Shook, or that a meeting of the minds occurred which gave rise to a binding contract between Beck and Metropolitan. Metropolitan contends that Greenwood's representations to this court provide ample evidence to demonstrate the existence of a agency relationship as well as a contract.

Amendment is futile when the amending party cannot in good faith state facts which plausibly give rise to a claim for relief or when the legal grounds for a claim is tenuous. *See Foulton v. Advantage Sales & Marketing, LLC*, No. 3:11-cv-01050-MO, 2012 WL 5182805 (D. Or. Oct. 18, 2012) (applying the *Iqbal* and *Twombly* "plausibility" standard to the court's futility analysis); *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990). In evaluating whether an amendment is futile, the court must analyze whether it would survive a 12(b)(6) motion to dismiss. *Id.* "Futility alone can justify the denial of a motion to amend." *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004).

A settlement agreement is "a contract in which one or more parties agree[] to abandon a claim or right." *Graves v. Tulleners*, 205 Or. App. 267, 279 (2006). To form a binding contract, there must be "a meeting of the minds of the parties" to the contract. *Rick Franklin Corp. V. State*

---

[1] Metropolitan's argument that it recently learned of facts in support of its theory during a June 16, 2014, hearing is address in the "Futility" section, *infra*.

*ex rel. Dept. of Transp.*, 207 Or. App. 183, 190 (2006).

    *A. Agency Relationship.*

    An agent may act on behalf of, and legally bind a principal in contract, if the agent acts with actual or apparent authority. *Taylor v. Ramsay-Gerding Constr. Co.*, 345 Or. 403, 409 (2008). Actual authority exists when "a principal explicitly authorizes the agent to perform certain acts." *Id.* at 410. Actual authority may be implied if a "principal implicitly permits the agent to do those things that are 'reasonably necessary' for carrying out the agent's express authority." *Id.* An agent may bind a principal, even in the absence of actual authority, where the agent has apparent authority. *Id.* Apparent authority arises when the principal takes some action which "when reasonably interpreted, causes a third party to believe that the principal consents to have the apparent agent act for him on that matter." *Id.*, *quoting Wiggins v. Barrett & Assocs., Inc.*, 295 Or. 679, 686-87 (1983). However, both actual and apparent authority are subject to a limited scope. *Eads v. Borman*, 351 Or. 729, 736 n.4 (2012). An agent may not bind a principal on a matter outside the agent's scope of authority. *Id.*

    Metropolitan cites no facts contemporaneous with the August 2012 meeting between Funk and Shook to support its theory that Shook had actual or apparent authority to bind Beck. Instead, it relies on statements Beck's attorney made during a motion hearing nearly two years after the August 2012 meeting between Funk and Shook. Clearly, statements made two years after the event at issue could not have created, at the time of that event, the impression that Shook had actual or apparent to bind Beck.[2]

---

[2] Metropolitan does not contend Beck's attorney's statements constitute ratification of Shook's act. It argues that Beck's attorney's statements revealed that Shook had authority to bind Beck *at the time* of Shook and Funk' August 2012 meeting.

OPINION AND ORDER - 12                                                   [RMD]

The record corroborates the conclusion that, in fact, neither Greenwood or Reilly represented Shook to have actual or apparent binding authority. Reilley's August 14, 2012, email to Funk states clearly that "Mr. Shook is a contractor and our retained consultant/expert. We fully expect that at some point, you would want to have a 'sit down' to discuss his scope and bid." Reilly even told Funk that Metropolitan may not directly communicate with Shook. Neither of these statements suggest that, during the August 28 and 29 meeting, Shook would be granted the authority to agree to a settlement on Beck's behalf. None of the letters Greenwood and Funk, and Greenwood and Thenell, exchanged between September 2012 and January 2013, contain any statements that would suggest Shook had authority of any kind to bind Beck, an absence consistent with Greenwood's continuous and direct communications with Metropolitan to negotiate a settlement of Beck's claim on her behalf. (Second Greenwood Decl., Exs. 1 through 5.)

B. *A Meeting of the Minds*

The record also makes clear that no meeting of the minds occurred between Shook and Funk or between Greenwood and Funk which gave rise to a binding settlement agreement. "The formation of a contract requires a 'bargain in which there is a manifestation of mutual assent to the exchange and a consideration." *Homestyle Direct, LLC v. Dep't of Human Servs.*, 354 Or. 253, 262 (2013), *quoting* Restatement (Second) of Torts § 17(1) (1981). Mutual assent, or a "meeting of the minds," may be expressed through words or "inferred from the actions of the parties." *Homestyle Direct*, 354 Or. at 262.

In opposition to Metropolitan's motion, Beck submitted a series of letters exchanged between Greenwood, Funk, and Thenell which evidence continued settlement negotiations after Funk met with Shook in August 2012. In Greenwood's first communication with Funk after the August 28

OPINION AND ORDER - 13                                                    [RMD]

and 29 appraisals, Greenwood wrote that "to settle the home loss we need to understand the changes [Metropolitan] is proposing and go over the changes with the owner of the home," and that he and Beck "would like to continue the negotiation and settlement process . . . ." (Second Greenwood Decl., Ex. 1 at 5.) In a September 28, 2012, email to Funk, Greenwood wrote, "[w]e confirm that we are still in the process of negotiating a settlement of the home fire loss . . . ." (Second Greenwood Decl., Ex. 2 at 1.) In an October 18, 2012, Greenwood sent a letter to Funk "as a continuation of the efforts to negotiate and settle the fire loss damage" to Beck's home. (Second Greenwood Decl., Ex. 3 at 1.) In it, Greenwood took issue with a lengthy list of Metropolitan's estimate proposals. (Second Greenwood Decl., Ex. 3 at 1-3.) Finally, in January 2013, Greenwood proposed a "last attempt" to settle the matter, which Metropolitan did not accept by the termination date of January 29, 2013. (Second Greenwood Decl., Ex. 3 at 3.) These letters show that no meeting of the minds occurred in August 2012 or thereafter which gave rise to a binding agreement between Beck and Metropolitan.

Metropolitan's own theory further establishes that no meeting of the minds could have occurred in August 2012. Metropolitan's theory is based on information revealed to it in June 2014, almost two years after Funk and Shook's August 2012 meeting. Simply stated, Metropolitan could not have entered into a contract in August 2012 if it did not know it was doing so, even assuming Shook did had actual or apparent authority. Consequently, Metropolitan could not reasonably have believed a binding agreement emerged from the August 2012 meeting. For this separate reason, Metropolitan's proposed amendments are futile.

## III. Prejudice to the Nonmoving Party

Metropolitan argues that granting leave to amend would not prejudice Beck because the new

OPINION AND ORDER - 14                                                      [RMD]

factual allegations are "based on the facts recently asserted by Plaintiff . . . ." (Def.'s Mot. to Amend at 3.) Beck contends that she would be prejudiced by Metropolitan's amendment because adding the proposed defenses would require an extension of discovery and would further delay her receipt of the insurance reimbursement she claims Metropolitan owes her. Of all the factors involved in the court's analysis, undue "[p]rejudice to the opposing party is the most important factor." *Jackson,* 902 F.2d at 1387. "A need to reopen discovery, a delay in the proceedings, or the addition of complaints or parties are indicators of undue prejudice." *Axial Vector Engine Corp.,* 2008 WL 4547795, at *5.

      Here, granting Metropolitan's motion would prejudice Beck. First, granting the motion would require additional discovery and fact discovery will close on August 29, 2014. Given the subject matter of Metropolitan's new allegations, granting its motion would require significant new discovery on topics previously unexplored by the parties, and likely involve new or reopened depositions. The court already has extended the discovery deadlines in this case on six separate occasions. Second, granting Metropolitan's motion would delay the proceedings of this case. The agency theory would add a new and more complicated aspect to this case, one likely to prolong the pendency of this action. Third, because the likely consequence of granting Metropolitan's motion would be to prolong this case, Beck would be prejudiced by expending additional resources on legal fees and costs. For these reasons, granting Metropolitan's motion would prejudice Beck.

## IV.  Remaining Factors

      Because the court concludes that Metropolitan's proposed amendments are unduly delayed, would be futile, and would prejudice Beck, the court need not evaluate whether Metropolitan's motion is brought in bad faith.

OPINION AND ORDER - 15                                          [RMD]

*Conclusion*

For the aforementioned reasons, Metropolitan's Motion for Leave to Amend Answer and Affirmative Defenses (Dkt. No. 54) is DENIED.

This 26th day of August, 2014.

IT IS SO ORDERED

JOHN V. ACOSTA
United States Magistrate Judge

[RMD]