IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

LUCILLE BECK, an individual,

               Plaintiff

     v.

METROPOLITAN PROPERTY AND
CASUALTY INSURANCE COMPANY,
a corporation,

               Defendant.

_____

Case No. 3:13-cv-00879-AC

AMENDED OPINION AND
ORDER[1]

ACOSTA, Magistrate Judge:

*Introduction*

     Twenty-eight days before the scheduled December 7, 2015 start date for trial, defendant

Metropolitan raised through a motion in limine a new contract interpretation theory it had not

---

[1] This Amended Opinion and Order corrects and supersedes the Opinion and Order (ECF
No. 221) filed September 12, 2016.

AMENDED OPINION AND ORDER - 1

previously asserted as a defense, presented by motion, or raised in any other way during the two and

one-half years this case had then been pending. Metropolitan's decision to advance for the first time

on the eve of trial a completely new and significant legal theory, and to do so through the awkward

procedural mechanism of an evidentiary motion – which Metropolitan failed to support with any

legal authority – was another baffling move in a series of bewildering tactical decisions it made

throughout this case. In responding to counsels' emails to the court disputing Metropolitan's attempt

to raise this issue, the court in part observed:

> Finally, any additional briefing Metropolitan offers on the matching issue will
> be deemed a motion for reconsideration, which I will deny in part for the reasons I
> stated above. On a related point, I note that Metropolitan has sought reconsideration,
> sometimes more than once, of virtually every procedural, discovery, and substantive
> ruling the court has made in this case. Metropolitan's approach to litigating this case
> will be taken into account the when court decides the amount of reasonable attorney
> fees Beck should recover.

(December 4, 2015 email from the court to counsel of record (ECF No. 185, at 1).)

Now pending for the court's consideration is Beck's Motion (ECF No. 205) for Attorneys'

Fees and Costs. The court has taken into account Metropolitan's approach to litigating this simple

insurance coverage dispute that involved no contested issues under the insurance policy other than

the amount of money Metropolitan owed Beck for the fire damage to her home. Based on a review

of the entire record and the relevant authorities, the court finds that Beck is entitled to attorney fees

in the amount of $1,081,370.50 and costs in the amount of $9,254.96.[2]

\ \ \ \ \

\ \ \ \ \

------

[2] The court finds this motion appropriate for disposition without oral argument pursuant
to LR 7-1(d)(1).

AMENDED OPINION AND ORDER - 2

*Background*

I.    The Parties' Pre-lawsuit Course of Dealing.

Plaintiff Lucille Beck filed this lawsuit against Metropolitan Property and Casualty Insurance Company for breach of a Metropolitan insurance policy ("the Policy") on her home, which was severely damaged in a fire on December 20, 2011.  Beck, through her insurance agent, notified Metropolitan of the fire the same day it occurred and Metropolitan accepted coverage for the loss. (ECF No. 92, at 3.)  On December 22, 2011, a Metropolitan employee inspected Beck's home.  (*Id.*) On January 4, 2012, Beck hired attorney Clarence Greenwood ("Greenwood"), who had been her family's attorney for many years, to negotiate her claim on her behalf with Metropolitan.  (ECF No. 24, at 1; ECF No. 67, at 1.)

On January 9, 2012, James Lawson ("Lawson"), a Metropolitan employee, prepared an estimate for the repair of Beck's home.  He calculated the Replacement Cost Value ("RCV") under the Policy at $380,608.36 and the Actual Cash Value ("ACV") at $348, 036.34 (ECF No. 92, at 3); both numbers accounted for depreciation.  (*Id.*, at 5.)[3]  On or near the same date, Metropolitan's retained consultant, Andrew McCabe of McBride Construction, produced an RCV estimate of $520,144.44.  (ECF No. 67-4, at 2.)  Two days later on January 11, 2012, Lawson created a slightly higher second estimate:  he now calculated the RCV at $382,471.56 and the ACV at $349,899.54. (ECF No. 92, at 4.)

On February 29, 2012, Metropolitan issued a check to Beck in the amount of $347,786.34.

---

[3]  The Policy defines "actual cash value" as "the amount which it would cost to repair or replace the covered property with material of like kind and quality, less allowance for physical deterioration and depreciation including obsolescence."  (ECF No. 8-1, at 8.)

AMENDED OPINION AND ORDER - 3

(*Id*.) This payment reflected the ACV amount contained in Lawson's first estimate, less Beck's $250 deductible. (*Id*.) Metropolitan also issued a second check for $12,594.00, which amount represented the cost of the demolition needed before the repair work could begin. (ECF No. 67-4, at 2.) Beck disputed that these amounts constituted the full ACV of her home.

On March 2, 2012 Greenwood's law firm hired Harry Shook ("Shook") as a consultant to evaluate Metropolitan's estimates and to provide his own an evaluation of the costs to repair or replace Beck's home. (*Id*.; ECF No. 89-1.) Greewood hired Shook in anticipation of litigation. (ECF No. 27, at 2.)

Later in March 2012 Metropolitan reassigned Beck's claim to a different adjustor, Spencer Funk ("Funk"). (ECF No. 92, at 4.) Funk prepared a fourth estimate for Beck's home that listed the RCV at $428,040.20 but did not include a calculation of the ACV under the Policy or apply depreciation. (*Id*.)

Between June and October 2012, the parties engaged in settlement discussions. (ECF No. 67, at 2.) During this period, on August 28, 2012, Greenwood met with Funk at Beck's home to discuss an approach to narrowing the areas of disagreement between parties' conflicting estimates. (*Id*.) Greenwood authorized Shook to meet with Funk the next day at the Beck home for that purpose. (*Id*.) Shook and Funk met on August 29 to inspect the Beck home and discuss their respective appraisals; later that same day, Greenwood and Beck met with Shook and Funk to discuss the results of the inspection. (*Id*., at 3.) Several hundred items still remained in dispute, however. (*Id*.; ECF 67-2, at 1.)

The parties continued to negotiate during the next two months. (*Id*.) On September 21,

2012, Funk wrote a letter to Greenwood in which he conveyed a "revised estimate of $434,041.62." (ECF No. 67-1, at 2.)  Greenwood responded in a September 28, 2012 email that Funk's letter provided specific descriptions for a few of the differences between the Funk and Shook appraisals, and that he and Beck needed descriptions for all the contested items.  ECF No 67-2, at 1.)  On October 18, 2012, Greenwood wrote a letter to Funk in advance of their call scheduled for the next day, to "outline the areas (items) that we find unsatisfactory in the September 21 MetLife proposal." (ECF No. 67-3, at 1.)

Beck and Metropolitan continued their negotiations.  On November 1, 2012, Funk sent a letter to Greenwood containing yet another repair estimate, this one in the amount of $438,882.50. (ECF No. 67-4, at 2.)  On January 21, 2013, Greenwood responded with his own letter, pointing out the numerous areas of disagreement between Beck and Metropolitan.  (ECF No. 67-4.)  Greenwood also stated that Beck "is making one last attempt to settle the home loss," and conveyed Beck's offer of $500,000.  (*Id.*, at 3.)

Metropolitan responded to Greenwood's January 21, 2013 letter not through Funk, but through the attorney, Daniel Thenell, who subsequently represented it in this lawsuit.  In a February 4, 2013 letter, Metropolitan's attorney set out a detailed rebuttal of the points and observations in Greenwood's letter.  (ECF No. 67-5.) The letter struck a decidedly combative tone:  it purported to identify "numerous factual inaccuracies" in Greenwood's letter, pointed-out many aspects of the situation that Greenwood "needed" to realize or understand, and made predictions about the legal significance in any subsequent litigation of the parties' settlement negotiations.  (*Id.*)

AMENDED OPINION AND ORDER - 5

II.    The Litigation of Beck's Lawsuit.

Beck filed this lawsuit on May 24, 2013.  (ECF No 1.)  From its outset, the sole issue to be decided in Beck's lawsuit was the amount of money Metropolitan owed her for the fire damage to her home.  Metropolitan never disputed its obligation under the Policy to pay Beck for her loss.  It never raised policy or coverage issues, or asserted any defense to Beck's contractual right to recover under the Policy.  For an insurance coverage lawsuit, then, the case was simple:  if the parties could not agree on the amount Metropolitan owed Beck, then at trial experts would give their opinions about the value of the damage to Beck's home and a jury would decide how much money Beck should be paid.

For a case that should have proceeded to a simple resolution, Metropolitan complicated it by finding numerous issues to litigate.  The first of these issues involved Metropolitan's attempts to overcome Beck's attorney-client and her attorneys' work-product privileges.  Metropolitan sought to depose Shook  regarding his valuation of Beck's loss as well as Greenwood.  Beck filed motions to oppose these efforts.  (*See* ECF No. 22 (Beck's Motion to Quash Deposition Subpoena to Clarence Greenwood); and ECF No. 25 (Beck's Motion to Quash Deposition Subpoena to Harry Shook (as amended, ECF No. 29).)  The court heard and granted both motions on June 16, 2014. The minute order memorializing its ruling states:

> **MINUTES of Proceedings:**  Motion Hearing held by Judge Acosta on Plaintiff's Motion (22) to Quash Subpoena as to Clarence Greenwood and Amended Motion (29) to Quash Subpoena as to Harry Shook.  ORDER:  GRANTING motions 22 and 29 to quash subpoenas as to Clarence Greenwood and Harry Shook respectively. FURTHER ORDERED that plaintiff to submit to the court for in camera review the 3/2/12 letter from plaintiff's counsel to Harry Shook.  FURTHER ORDERED that no further discovery of materials or information in the possession of Clarence Greenwood or Harry Shook will be allowed.

(June 16, 2014 Minute Order, ECF No. 45 (underline added).)

On July 3, 2014, Beck filed a Motion for Protective Order.  (ECF No. 49.)  Beck sought to prevent Metropolitan from obtaining through a subpoena to Wells Fargo Home Mortgage her "account statements from 2010 to present and from 2008 to present" and further "forbidding any inquiry into her financial affairs."  (*Id.*, at 2.)  Beck asserted a simple argument to support her motion:  "This Court should grant Mrs. Beck's Motion for Protective Order, quashing those subpoenas and foreclosing any further inquiry into Mrs. Beck's financial affairs because such inquiry is irrelevant to the only factual question to be resolved in this litigation:  how much money [Metropolitan] owes Mrs. Beck under the insurance policy it issued her."  (*Id.*)  In its opposition to Beck's motion, Metropolitan justified its subpoena with this explanation:

> A financial motive exists to inflate the insurance claim to protect the estate of Plaintiff and the intertwined financial condition of the beneficiaries of her estate, her four adult children.  Specifically, it is in Plaintiff's financial interest to obtain an Actual Cash Value (ACV) assessment which exceeds the current balance of her outstanding home equity loans and mortgages on the property.  Discovery of such loans and outstanding debts is necessary to establish defenses in this action and is reasonably calculated to lead to admissible evidence in this action.

(ECF No. 52, at 4.)  Metropolitan's apparent rationale for this theory was Beck's "advanced age" and, apparently, her theorized desire to preserve the assets of her estate for her children's benefit when she died.

Beck correctly pointed out in her reply (ECF No. 56) to Metropolitan's opposition brief the flaws in Metropolitan's logic.  First, Beck's purported "motive" was irrelevant to determining the ACV of her home, because the ACV determination would turn on expert evidence regarding the cost to repair or replace her home and not on Beck's purported financial motive.  Second, and more troubling, Metropolitan offered absolutely no evidence to suggest Beck had any motivation to

manipulate the value of her home for any purpose, or that she had attempted to do so at anytime during the pre-lawsuit claims process or once she filed her lawsuit.

Two weeks later, on July 16, 2014, and almost thirteen months since it filed its initial answer (ECF No. 8), Metropolitan filed its Motion to Amend Answer and Affirmative Defenses (ECF No. 54) in a second attempt to pierce Beck's attorney-client privilege and her attorneys' work-product privilege. Metropolitan sought to add seven new affirmative defenses, all based on the premise that Beck and Metropolitan had reached an agreement on the amount needed to repair her home. Metropolitan contended that Beck's expert, Harry Shook, possessed apparent authority to make that agreement on Beck's behalf.

On July 17, 2014, the court heard argument on Beck's Motion (ECF No. 49) for protective order. The court granted Beck's motion in its entirety, thus precluding Metropolitan from inquiring into Beck's financial affairs. (ECF No. 62.) The court also set a briefing schedule for Metropolitan's motion to amend its answer. (*Id*.)

Less than one week later, on July 23, 2014, Metropolitan made its third attempt to pierce Beck's attorney-client privilege and her attorneys' work-product privilege by filing a Motion (ECF No. 63) for Reconsideration of Discovery Ruling. This time, Metropolitan claimed to have "new evidence" to support its position it should be able to depose Beck's expert. (ECF No. 64, at 3-4.) Metropolitan based its motion, however, not on "new" evidence, the two-page 2012 engagement letter (*see* ECF No. 89-1) from Beck's lawyers to her expert, Shook, which Metropolitan received following the court's *in camera* review and contained no new information about Shook's role as Beck's expert. Instead Metropolitan's motion advanced a newly conceived argument based on facts in its possession for two years, Beck's disclosure of Shook's appraisal report to Metropolitan's

adjuster during the 2012 claims process between the parties. Beck opposed the motion, arguing that the Shook engagement letter did not constitute new evidence. (ECF No. 79.) Metropolitan also asked for expedited consideration of its motion, which request Beck also opposed (ECF No. 70) and the court denied. (July 25, 2014 Minute Order (ECF No. 71).)

On July 30, 2014, the court heard argument on Metropolitan's motion to amend. The court denied Metropolitan's motion. (July 30, 2014 Minute Order (ECF No. 73); August 26, 2014 Opinion and Order (ECF No. 86).) During the hearing, the court commented on the untimeliness of Metropolitan's attempt to introduce into the case theories available and known to it at the time Beck filed her lawsuit in May 2013:

> If the defendant believed that the scope of work was agreed upon between Mr. Funk and Mr. Shook in August of 2012, the defendant could have and should have raised all of these arguments as soon as the lawsuit was filed, because the defendant knew there are no new facts . . . . [T]he record of this case bears witness that counsel for the defendant certainly knows how to file motion, brief them, and provide affidavits in support.

(ECF No. 76, at 6-7, 10-11.)

On August 6, 2014, Metropolitan filed a Motion (ECF No. 77) to Compel in a fourth attempt to penetrate Beck's attorney-client privilege and her attorneys' work-product privilege. Metropolitan asked the court to allow it to depose Beck's children "regarding their conversations with Plaintiff's non-testifying expert Harry Shook; their conversations with Plaintiff's attorneys both pre- and post-litigation; conversations with contractors; and their understanding of the dispute regarding the various scope of repairs." (ECF No. 77, at 2.) Metropolitan had noticed and taken the depositions of Beck's three adult children and during those depositions learned that each of them had talked with Greenwood and Shook during the pre-lawsuit claims process. (*Id.* at 3-8.) Metropolitan

argued that the presence of one or more of Beck's children during discussions with Beck's lawyers and expert waived the attorney-client and attorney work-product privileges, and Metropolitan was entitled to question each of the three children about those conversations. (*Id*. at 8-11.) Beck opposed Metropolitan's motion, arguing that the court previously had ruled Metropolitan could not depose Shook and Greenwood and could not inquire into her financial affairs or alleged "motives" for filing and pursuing her claim, and pointing out the irrelevance of the information Metropolitan sought. (ECF No. 83.)

Hearing on Metropolitan's motion for reconsideration and motion to compel occurred on August 15, 2014. The court denied the motion for reconsideration. (August 15, 2014 Minute Order (ECF No. 84).) At the hearing, the court expressed its frustration with Metropolitan's continued efforts to untimely raise legal theories long available to it: "[C]oming up with a theory two years after the events at issue that you now claim constituted a settlement is, putting it quite charitably, a far stretch." (ECF No. 87, at 15.) In its September 5, 2014 Opinion and Order (ECF No. 89) setting out its analysis of Metropolitan's arguments, the court observed that the Shook engagement letter, though a new document in the case produced after *in camera* review, contained no information not previously known to Metropolitan. (*Id*., at 7-9.) As to the motion to compel, the court denied that part of the motion which sought permission to depose Beck's children, and it deferred that part of the motion which sought to depose Shook. (ECF No. 84; ECF No 96.[4])

On September 23, 2014, Beck filed a Motion (ECF No. 92) for Partial Summary Judgment,

_____

[4] The court deferred ruling on Metropolitan's request to depose Shook pending Beck's attorney's notification to Metropolitan's attorney whether she intended to call Shook as a trial witness. (Transcript of August 15, 2014 Hearing (ECF No. 87), at 45-46.)

AMENDED OPINION AND ORDER - 10

in which she sought a ruling that Metropolitan breached the insurance contract by not paying her the ACV of her home, and that she was entitled to her attorney fees pursuant to ORS 742.061. On October 29, 2014, Metropolitan filed its Motion (ECF No. 104) for Partial Summary Judgment. In its motion, Metropolitan sought summary judgment on its second (failure to comply with contractual obligations and fourth (failure to perform condition precedent) affirmative defenses, both of which relied on Beck's alleged failure to repair her home within one year of Metropolitan's ACV payment. (*See* ECF No. 8, at 5-6.) On October 30, 2014, Beck filed its combined Response to Metropolitan's partial summary judgment motion and her own Cross-Motion for Partial Summary Judgment (ECF No. 107) on Metropolitan's two affirmative defenses.

On July 6, 2015, the court denied Metropolitan's motion and granted Beck's motion. (July 6, 2015 Opinion and Order, ECF No. 114.) The case would proceed to trial "for the purpose of determining the true RCV and ACV of [Beck's] home." (*Id*. at 13-14.)

On July 29, 2015, the court set a four-day jury trial to begin on December 7, 2015. (ECF No. 116.) The court also set November 2, 2015, as the deadline for initial Pretrial documents, and November 24, 2015 as the pretrial conference date. (*Id*.)

On September 14, 2015, the court convened a discovery hearing at Metropolitan's request. At the hearing Metropolitan's attorney explained "I got an e-mail forwarded to me from my client from the insurance agent in Portland. I called her and learned that there is some information regarding e-mails, et cetera, in her file – or at least an e-mail, and she also had certain meetings with Ms. Beck and the Beck children and perhaps Clarence [Greenwood]." (Transcript of September 14, 2015 discovery hearing (ECF No. 179), at 3.) Metropolitan's attorney explained that although discovery had closed he wanted to issue a subpoena for the insurance agent's file. (*Id*., at 4.)

AMENDED OPINION AND ORDER - 11

Counsel then explained he wanted to agent's file "because I think there is probably impeachment material in there of potential trial testimony concerning any replacement cost claim. . . .  I believe that the agent has information that indicates that there is never ever going to be any attempt or has never been any attempt to rebuild a house."  (*Id.*)  Metropolitan's request to subpoena Beck's insurance agent's file constituted its fifth try at getting past Beck's attorney-client privilege and another effort to delve into Beck's "motives" for pursing her insurance claim and her alleged intent to not rebuild her home, and a renewed attempt to get information from Beck's children.

In response, Beck's attorney pointed out that the email Metropolitan's attorney received the day before was dated April 4, 2012, and had been in the possession of Metropolitan's adjuster assigned to the case for the three and one-half years since that time.  (*Id.*, at 5-6.)  The court then stated:

> THE COURT:  You know, Mr. Thenell, the content of the e-mail sent by Ms. Sailor [Beck's insurance agent] to Mr. Funk [Metropolitan's adjuster] in April 2012 speaks to a theory that the defendant in this case has advanced  with some considerable energy.  It is very difficult for me to – it is very difficult for me to conclude that the discovery you are asking for now should be permitted when it seems quite reasonable to have expected the defendant to get information like this either from Mr. Funk or from Ms. Sailor.
>
> I will say the record makes very clear you made considerable efforts to talk to anyone who might know of Ms. Beck's intent to not rebuild the house, but instead, to keep the money, even if that is a relevant theory in this case, and I'm not sure that it is at all.
>
> But assuming it is, you made considerable efforts to depose everyone you could possibly find, or think to depose, to find out if, in fact, she had talked to anyone about doing exactly that which this e-mail apparently conveys, at least by one of her kids.
>
> * * * *
>
> But on the record that I have, and given the many discovery motions and the

AMENDED OPINION AND ORDER - 12

> issues we've had, including on this very theory, I cannot conclude the defendant
> should not have discovered this or could not have discovered this piece of
> information earlier than now.

(*Id*., at 13-14.)

The court denied Metropolitan's request to issue a subpoena. (*Id*., at 14.) Dissatisfied with only an oral ruling denying his request, Metropolitan's attorney stated "I'll ask my client if they want us to fully brief this, Judge." (*Id*., at 15.) Briefing, however, would not change either that Metropolitan simply had failed to be diligent in discovering the email in the three and one-half years it had been in its own claims file, or that the email pertained to an issue the court had several times ruled irrelevant to determining the amount of money Metropolitan owed Beck under the Policy. The court responded that Metropolitan's inadvertent failure to timely discover allegedly relevant evidence that had been in its possession for several years did not constitute "good cause" to reopen discovery three months before the scheduled trial date. (*Id*., at 15-16.)

The parties' initial pretrial documents were to be filed on November 2, 2015, but not only did Metropolitan file its documents one day late, it also filled its witness list and exhibit list with evidence the court previously had ruled irrelevant or not discoverable. For example, in its witness list Metropolitan indicated that Spencer Funk, the adjuster assigned to Beck's claim from the outset, would testify "regarding the communications he had with Plaintiff's representatives and that two of Plaintiff's representatives agreed to the final scope of repair upon which Defendant based its payments and coverage decision" (ECF No. 122, at 2), despite the court's ruling on multiple occasions that the attorney-client and attorney work-product privileges precluded discussions of those very discussions. In its exhibit list Metropolitan listed as exhibits the Shook engagement letter, various emails from Shook, the "Agreed Estimate," and numerous letters from Greenwood (ECF No.

AMENDED OPINION AND ORDER - 13

121, at 2-3), even though on multiple occasions the court had ruled on such documents either as irrelevant or not discoverable because of the attorney-client and attorney work-product privileges. Beck timely filed objections to this evidence.  (ECF No. 153, ECF No. 156.)

Four days later, on November 6, 2015, Metropolitan filed a Motion (ECF No. 145) to Reschedule Trial Date.  Metropolitan sought a continuance because it had designated the same the employee scheduled to represent it and testify at trial to also represent it in a Washington state court trial set to begin the same day.  (ECF No. 145, at 2.)  Additionally, Metropolitan's other trial witness as well as its trial counsel in Beck's case both were listed as witnesses in the Washington case.  (*Id.*)  Beck opposed the continuance request.  (ECF No. 149.)

The court convened a phone hearing on Metropolitan's motion that same day.  As Beck pointed out in her opposition memo, not only had Beck filed her case before the plaintiff the in the Washington case, Metropolitan had agreed to the December 7, 2015 trial date in her case at the July 29, 2015 trial-setting conference knowing but not disclosing to the court that the existence of the Washington case, that it already had been set to begin trial on the same date, and that it presented a direct scheduling conflict for its corporate representative and witnesses.  (ECF No. 149, at 1-2.)  The court denied Metropolitan's motion.  (ECF No. 151.)[5]

On November 9, 2015, Beck filed her Motions (ECF No. 152) in Limine.  In those motions Beck moved to exclude all exhibits listed and witnesses identified in Metropolitan pretrial filings that pertained to topics the court previously had ruled not relevant or not discoverable.  Metropolitan also filed its Motions (ECF No. 155) in Limine, which consisted of 12 separate motions the last of

---

[5]  The Washington case subsequently settled before the November 24, 2015 pretrial conference.

AMENDED OPINION AND ORDER - 14

which was entitled "Motion 12:  Exclude Any Evidence or Argument Regarding 'Matching.'" (*Id.* at 10.)  The entire motion read:

> The subject insurance policy only obligates Defendant to pay for those repairs and/or replacements of the structure which were damaged as a result of a covered peril. *See*, Defendant's Ex. 101 (Policy) at 26, stating "*Subject to the applicable deductible, **we** will pay the **actual cash value** at the time of loss for the damaged property . . ."*
>
> The subject insurance policy does not obligate Defendant to issue benefits to match any undamaged areas. This is commonly referred to as "matching."  For example, if the underlying fire caused damage to only some of Plaintiff's roof shingles, Defendant is not obligated to replace to entire roof so as to match all of the singles.  Defendant only owes to replace those shingles damaged as a result of a covered peril with materials of "like, kind and quality."  If the appearance of the replacement shingles does not match the existing, non-damaged shingles, Defendant does not owe to replace all shingles so as to "match" them.  Defendant is only obligated to replace those shingles damaged as a result of a covered peril.
>
> Defendant therefore respectfully moves this Court for an Order *in limine* excluding evidence or argument of this "matching" because the subject insurance policy does not provide coverage for this.

(ECF No. 155 at 10.)

Under the ambit of a motion in limine, Metropolitan for the first time had raised this significant and material policy interpretation issue.  Moreover, it used only three short paragraphs to do so and cited no legal authority to support its argument.  By contrast, Beck's written opposition (ECF No. 170) countered Metropolitan's "matching" argument with three pages of analysis that relied on cases having addressed "matching" arguments and having declared that prohibitions on "matching" require explicit provisions in the insurance policy so stating.  (ECF No. 170, at 6-8.)

On November 24, 2015, the pretrial conference took place.  During the conference the court raised its concern about Metropolitan's continued attempt to reargue and relitigate the court's prior rulings regarding Shook, Greenwood, the attorney-client privilege, the attorney work-product

AMENDED OPINION AND ORDER - 15

privilege, and testimony from Beck's children:

> "THE COURT:  See, now that's the problem.  There are multiple places in your trial brief, your motions in limine, and your witness statements where the witnesses talk about an agreement.  And I'm pretty sure that I decided this issue in connection with the parties' briefing and rebriefing on motions for reconsideration that the attorney-client privilege applied to those communications."
>
> \* \* \* \*
>
> "And I don't understand how, based on prior rulings, any of your witnesses can mention any form of agreement."

(ECF No. 175, at 28.)  A discussion then ensued between Metropolitan's attorney and the court regarding the court's prior rulings on the attorney-client privilege and settlement issues Metropolitan had raised and re-raised throughout the case.  (*Id*., at 29-30.)  Ultimately, the court observed:

> You know, maybe it's just me, but I'm pretty sure we had these discussions on multiple occasions in the past 18 to 24 months. . . .  You argued in your trial brief and motions in limine that [the court's order precluding discovery of information from Mr. Shook and Mr. Greenwood] didn't preclude you from subpoenaing [Mr. Shook and Mr. Greenwood] here at trial and asking them all the same things I told you you couldn't have in discovery.  I have to tell you I was at a complete loss to understand how you could take that position.

(*Id*., at 30-31.)

Toward the conclusion of the pretrial conference, the court addressed two legal issues raised in the parties' pretrial documents, both of which Metropolitan raised and included the "matching" issue.  The court observed:

> And then the only other issue I saw for my resolution was the issue you raised, Mr. Thenell, on what you called the matching.  And I think that was your last motion in limine.
>
> The plaintiff responded that matching – that was the first time that had been raised.  It was not asserted as a policy defense or otherwise brought up in any other context, and that the policy doesn't include language that other policies do that have been interpreted to prohibit matching.

AMENDED OPINION AND ORDER - 16

So it seems to me, based on the information in the filings right now, that that is an area not precluded from Mrs. Beck's inquiry and pursuit. In other words, she gets to talk about it, her experts and lay witness contractors get to talk about it.

(*Id.*, at 34.)

Six days later, on November 30, 2015, the court filed its Order (ECF No. 174) on Motions in Limine. The court granted each of Beck's motions that sought to preclude Metropolitan from introducing evidence regarding Shook and Greenwood, the attorney-client privilege, the attorney work-product privilege, and Beck's children's discussions with them. (*Id.*, at 1-12, 15-16.) The court also denied Metropolitan's Motion 12 regarding "matching." (*Id.*, at 20-28.)

Also on November 30, 2015, six days after the pretrial conference and fully four weeks after the deadline for filing witness lists, Metropolitan filed its Amended Trial Witness List (ECF No. 173). Metropolitan filed the amended list without seeking leave of court to do so – in violation of the clearly stated directive in the court's July 29, 2015 Jury Trial Management Order that "No amended versions of these documents will be permitted without court approval and upon showing of good cause. Amended versions submitted without court approval will be stricken." (ECF No. 117, at 2.) Beck objected to Metropolitan's amended witness list, and in particular to testimony from Borden Beck, one of Beck's children and the new witness Metropolitan added to its original list, because of the court's prior rulings excluding him as a trial witness. (ECF No. 176, at 6-7.) The court sustained Beck's objection and struck Borden Beck as a trial witness. (ECF No. 177, at 3-4.)

On December 3, 2015, four days before the first scheduled trial day, Beck's attorney emailed the court to raise three concerns regarding Metropolitan's proposed trial evidence. (ECF No. 185, at 2-4.) In response to that email, on December 4, 2015, Metropolitan's attorney addressed the issues Beck's attorney raised but also stated that Metropolitan would be "supplying . . . additional authority

AMENDED OPINION AND ORDER - 17

on matching" (ECF No. 185, at 5), even though the court had orally ruled at the pretrial conference

that Beck could pursue matching under the Policy and had denied in its motions in limine order

Metropolitan's motion seeking to exclude such evidence. The court wrote to the parties' respective

attorneys later on December 4 to address their disputes, including the disagreement over "matching":

> Dear Counsel:
>
> This email responds to Ms. Schroeder's email of December 3 regarding Mr. Nickle's proposed testimony and the Coverage A Plus issue, and to Mr. Thenell's response email of December 4.
>
> **1. Matching:** I will not consider any additional briefing on matching. Matching is a matter of contract interpretation but Metropolitan raised the matching issue for the first time in a motion in limine, which is the wrong procedural mechanism to seek a ruling on an issue of contract interpretation. Metropolitan should have filed a motion for declaratory judgment or summary judgment on the matching issue during the two years the case was pending before pretrial documents were due. It did not. The time for submitting briefing on the matching issue has long passed.
>
> Furthermore, I note with considerable dissatisfaction that Metropolitan provided absolutely no authority to support its motion in limine on matching. In fact, Metropolitan devoted barely two-thirds of one page of its eleven-page motion in limine document on this important issue. The complete lack of supporting authority caused me to spend a significant part of last Saturday and Sunday researching and drafting the ruling on the matching issue, time spent in addition to the other pretrial rulings I worked on. For reasons not explained, Metropolitan provided absolutely no authority or other guidance of any kind to the court on the point. Metropolitan had years to present a supported and briefed argument on the matching issue and it did not. The court's ruling has been made and the issue is closed.
>
> Finally, any additional briefing Metropolitan offers on the matching issue will be deemed a motion for reconsideration, which I will deny in part for the reasons I stated above. *On a related point, I note that Metropolitan has sought reconsideration, sometimes more than once, of virtually every procedural, discovery, and substantive ruling the court has made in this case. Metropolitan's approach to litigating this case will be taken into account the when court decides the amount of reasonable attorney fees Beck should recover.*

(ECF No. 185, at 1 (italics added).)

AMENDED OPINION AND ORDER - 18

III.    Trial.

Trial began on December 7, 2015.  (ECF No. 181.)  During that day and the next three days,

the parties presented evidence.  (ECF Nos. 181, 183, 185, and 186.)  On the afternoon of the trial's

fifth day, December 11, the jury returned a verdict for Beck of $547,192.63 for the ACV of her home

and $596,720.42 for the replacement cost value ("RCV") of her home.  (ECF Nos. 188, 191.)  On

January 15, 2016, the court entered judgment on the verdict.  (ECF No. 200.[6])  The judgment

provides that Beck is entitled to recover her reasonable attorney fees and costs pursuant to ORS

742.061 and Federal Rule of Civil Procedure 54(d).

On February 12, 2016, Beck filed her Motion (ECF No. 205) for Attorneys Fees and Costs

and her Cost Bill (ECF No. 207.)  Beck contends her attorney fees amount to $597,699.25, and she

seeks a 2.0 multiplier of her fees, for a total request of $1,195,398.50 in attorney fees.  Beck also

asks for $19,525.15 in recoverable costs.[7]  Metropolitan concedes that Beck is entitled to fees and

costs under ORS 742.061(1) but disputes the reasonableness of the fees and costs Beck requests.

*Legal Standards*

The prevailing party is entitled to recover attorney fees where a statute so provides.  FED. R.

CIV. P. 54 (prevailing party entitled to costs and attorney fees if provided by statute, rule or order);

United States District Court, Oregon, Local Rule ("LR") 54-3 (citing FED. R. CIV. P. 54(d)(2)(B)

and requiring a motion for attorney fees to "set forth . . . all supporting authorities").  Oregon statute

---

[6] February 25, 2016, the date of Metropolitan's check paying Beck pursuant to the judgment, is the true ACV payment date for all purposes under the Policy.

[7] In her Reply (ECF No. 217), Beck adjusted the amount of fees and costs sought in her initial motions to account for the time incurred in responding to Metropolitan's response to her motion.  (*Id.*, at 32-33.)

AMENDED OPINION AND ORDER - 19

explicitly permits a prevailing-party insured to recover attorney fees in an insurance policy coverage lawsuit under specific conditions:

> **742.061 Recovery of attorney fees in action on policy or contractor's bond.** (1) Except as otherwise provided in subsections (2) and (3) of this section, if settlement is not made within six months from the date proof of loss is filed with an insurer and an action is brought in any court of this state upon any policy of insurance of any kind or nature, and the plaintiff's recovery exceeds the amount of any tender made by the defendant in such action, a reasonable amount to be fixed by the court as attorney fees shall be taxed as part of the costs of the action and any appeal thereon.

ORS § 742.061 (2015). If these conditions are met, then the court "shall" award attorney fees; the decision is not a discretionary one. *Petersen v. Farmers Ins. Co. of Or.*, 162 Or. App. 462, 466 (1999). *See also Or. Realty Co. v. Greenwich Ins. Co.*, No. 3:12-cv-200-MO, 2013 WL 3287092, at *2 (D. Or. June 28, 2013) (once the court finds that "the conditions of the statute are met, the award pursuant to the statute is not discretionary"), *amended on reconsideration on other grounds*, 2013 WL 4859305 (D. Or. Sept. 11, 2013).

The statute's guiding premise is reasonableness. To assess reasonableness, the court considers the factors contained in ORS 20.075. *Alexander Mfg. Inc. Emp. Stock Ownership Plan & Trust v. Ill Union Ins. Co.*, 688 F. Supp. 2d 1170, 1181 (D. Or. 2010); *Strawn v. Farmers Ins. Co.*, 233 Or. App. 401, 407 (2010). . The policy underlying the statute is to encourage settlement of insurance claims without litigation. *Hennessy v. Mut. of Enumclaw Ins. Co.*, 229 Or. App. 405, 409 (2009).

*Discussion*

I.    The ORS § 742.061 Elements.

To recover her reasonable attorney fees Beck must show that she submitted a proof of loss, that Metropolitan did not settle her claim within six months of that date, that she filed a lawsuit on

the claim, and that her recovery at trial exceeded the amount Metropolitan offered to pay her to settle

her claim within six months of her submission of her proof of loss. *Petersen*, 162 Or. App. at 465-

66.

Metropolitan argues that Beck cannot recover attorney fees because she cannot satisfy the

statute's proof-of-loss requirement, but Beck meets this requirement for each of three reasons. First,

the court previously found that Metropolitan's January 9, 2012 initial estimate satisfied the proof-of-

loss requirement. (July 6, 2015 Opinion and Order (ECF No. 114), at 13 ("Here, Beck timely filed

proof of loss").) Consistent with that finding, the court's January 15, 2016 Judgment (ECF No. 200)

contains an award of prejudgment interest from the March 9, 2012 proof-of-loss date until entry of

judgment. (ECF No. 200, at 2-3).

Second, Metropolitan waived this defense. Its answer contains no assertion that Beck failed

to comply with the Policy's proof-of-loss requirement; the only breach of contract allegations

Metropolitan leveled at Beck were for failing to cooperate with its investigation of the claim and

failing to repair or replace her home within one year of Metropolitan's February 29, 2012 ACV

payment. (Answer (ECF No. 8), at 5-6.)[8] Nor did Metropolitan assert Beck's alleged failure to

provide proof-of-loss in its Motion (ECF No. 104) for Partial Summary Judgment, Trial Brief (ECF

No. 124), or Motions (ECF No. 155) in Limine.

Furthermore, waiver is evident by Metropolitan's conduct following Beck's December 20,

2011 notification of the loss. Metropolitan began its investigation of the loss two days after the fire

---

[8] In its proposed Amended Answer (ECF No. 55-1), none of the additional affirmative
defenses Metropolitan sought to add raised this issue.

AMENDED OPINION AND ORDER - 21

by inspecting Beck's home, which resulted in Lawson's 103-page report dated January 9, 2012. (Plaintiff's Trial Exhibit 4.)  Subsequently, Metropolitan adjustors and representatives prepared additional estimates in January and February 2012.  On February 29, 2012, Metropolitan issued payment to Beck for the ACV under the Policy.

Third, the facts show the statute's proof-of-loss requirement is satisfied here, as the case decisions addressing the proof-of-loss requirement make clear.  "Proof of loss" is defined quite broadly.  *Precision Seed Cleaners v. Country Mut. Ins. Co.*, 976 F. Supp. 2d 1228, 1237-38 (D. Or. 2013).  Under ORS 742.061, proof of loss is "any event or submission that would permit an insurer to estimate its obligations."  *Precision Seed,*, 976 F. Supp. 2d. at 1237 (citing *Dockins v. State Farm Ins. Co.*, 329 Or. 20, 985 P.2d 796 (1999)).  The insured need not "calculate the loss with sufficient specificity to enable the insurer to make a settlement offer," *Precision Seed*, 976 F. Supp. 2d at 1237; instead, the question is "whether the insurer could have made the necessary calculation had it made a reasonable inquiry."  *Id*. at 1237-38, citing *ZRZ Realty Co. v. Beneficial Fire & Cas. Ins. Co.*, 222 Or. App. 453, 494 (2008).

Here, the equivalent of a proof-of-loss within the meaning of ORS 742.061 is present.  Beck submitted her claim on December 20, 2011, the day of the fire in her home.  Metropolitan acknowledged Beck submitted that claim.  (ECF No. 124, at 2 ("Plaintiff filed a claim for damages under her homeowner's insurance policy issued by Defendant.").)  Two days after the fire, a Metropolitan adjustor inspected Beck's home and, based on that inspection, on January 9, 2012, he prepared a written estimate of the cost to repair Beck's home, which estimate included both an RCV of $380,608.36, and an ACV of $348, 036.34 under the Policy.  Metropolitan subsequently prepared additional estimates and ultimately, on February 29, 2012, it paid Beck $347,786.34, the amount it

determined the ACV of her home under the Policy.    Under controlling Oregon case law, Metropolitan clearly had information sufficient to "permit an insurer to estimate its obligations."

Therefore, Beck satisfies the elements of ORS § 742.061 and, thus, is entitled to an award of attorney fees.

II.    The ORS § 20.075(1) Factors.

Subsection (1) of the statute contains factors used to determine *whether* to award attorney fees, but that statutory determination is not made where, as here, an award of attorney fees is mandatory.  As the Oregon Court of Appeals observed:

> ORS 20.075(1) provides that a court must consider a list of factors "in determining whether to award attorney fees in any case in which attorney fees are authorized by statute *and in which the court has discretion to decide whether to award attorney fees* [.]"  (Emphasis added.)  The statute does not apply to the decision "whether to award attorney fees" under ORS 742.061.  If the conditions enumerated in that statute are met, the decision whether to grant attorney fees is not a discretionary one. Instead, when the statutory conditions are met, the court "shall" award attorney fees.

*Petersen*, 162 Or. App. at 466.  Because the court has determined under ORS § 742.061 that Beck is entitled to her attorney fees in this case, the court need not address the subsection (1) factors to determine whether she is entitled to attorney fees.

III.    The ORS § 20.075(2) Factors.

ORS § 20.075(2) guides the court's determination of the amount of the fees a prevailing insured should receive.  Under that subsection the court applies 16 factors to determine the amount of fees to award:

> (2) A court shall consider the factors specified in subsection (1) of this section in determining the amount of an award of attorney fees in any case in which an award of attorney fees is authorized or required by statute.  In addition, the court shall consider the following factors in determining the amount of an award of attorney fees in those cases:

AMENDED OPINION AND ORDER - 23

(a) The time and labor required in the proceeding, the novelty and difficulty of the questions involved in the proceeding and the skill needed to properly perform the legal services.

(b) The likelihood, if apparent to the client, that the acceptance of the particular employment by the attorney would preclude the attorney from taking other cases.

(c) The fee customarily charged in the locality for similar legal services.

(d) The amount involved in the controversy and the results obtained.

(e) The time limitations imposed by the client or the circumstances of the case.

(f) The nature and length of the attorney's professional relationship with the client.

(g) The experience, reputation and ability of the attorney performing the services.

(h) Whether the fee of the attorney is fixed or contingent.

The subsection (1) factors are:

(a) The conduct of the parties in the transactions or occurrences that gave rise to the litigation, including any conduct of a party that was reckless, willful, malicious, in bad faith or illegal.

(b) The objective reasonableness of the claims and defenses asserted by the parties.

(c) The extent to which an award of an attorney fee in the case would deter others from asserting good faith claims or defenses in similar cases.

(d) The extent to which an award of an attorney fee in the case would deter others from asserting meritless claims and defenses.

(e) The objective reasonableness of the parties and the diligence of the parties and their attorneys during the proceedings.

(f) The objective reasonableness of the parties and the diligence of the parties in pursuing settlement of the dispute.

(g) The amount that the court has awarded as a prevailing party fee under ORS 20.190.

(h) Such other factors as the court may consider appropriate under the circumstances of the case.

By its terms, the statute directs that in determining the amount of fees to award, the court considers the factors under both subsections (1) and (2). Furthermore, reasonableness guides the court's determination of the amount of fees to award, because "[n]othing in this section authorizes the award of an attorney fee in excess of a reasonable attorney fee." ORS § 20.075(4).

The court notes that Metropolitan's counsel argues the ORS 20.075(1) factors apply only to the court's determination whether to award fees and not to the amount of fees to award (*see, e.g.,* ECF No. 213, at 10), but this argument is both wrong and yet another troubling example of his inattention to or disregard of the language of statutes, cases, and this court's rulings. First, his argument is directly contrary to the explicit language of ORS §20.075(2), which states clearly that the court "shall consider the factors specified in subsection (1) in determining the amount of an award of attorney fees[.]" It is difficult to understand how Metropolitan's counsel could have read the statute to mean the factors did not apply to determining the amount of fees.

Second, Judge Hernandez of this court previously instructed Metropolitan's counsel about the statute's meaning in another insurance coverage case. On the applicability of the subsection (1) factors to determining the amount of fees to award, Judge Hernandez observed:

"Finally, Defendant alternatively argues that even if attorney fees are directed by O.R.S. 742.061, they should be denied under the factors in O.R.S. 20.075(1). However, as other Judges in this District have explained, when an attorney fee award is mandated by O.R.S. 742.061, the factors of ORS 20.075(1) do not apply to the analysis of whether to award fees. *Or. Realty Co.*, 2013 U.S. Dist. LEXIS 91232, 2013 WL 3287092, at *2 (because the conditions of O.R.S. 742.061 were met, O.R.S. 20.075(1) was relevant to the amount of fees but not to whether to award

fees); *McCormick & Schmick's Seafood Rest., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, No. 03:08-cv-01011-AA, 2011 U.S. Dist. LEXIS 113881, 2011 WL 4625728, at *3 (D. Or. Sept. 30, 2011) (after determining that the plaintiff was entitled to fees under O.R.S. 742.061, court evaluated reasonableness of fee request using factors O.R.S. 20.075(1))."

*Precision Seed Cleaners v. Country Mutual Ins. Co.*, 976 F. Supp. 2d 1228, 1240 (D. Or. 2013).

Accordingly, to determine the amount of fees to award Beck, the court will begin with the subsection (1) factors and then address the subsection (2) factors.

IV.    Attorney Fee Award.

    A.    *ORS § 20.075(1)(a):  The conduct of the parties in the transactions or occurrences that gave rise to the litigation, including any conduct of a party that was reckless, willful, malicious, in bad faith or illegal.*

This factor requires the court to evaluate the parties' respective pre-litigation conduct.  The record shows that although both parties invested time and effort for approximately 14 months in a mutual attempt to negotiate a resolution of Beck's claim, early on Metropolitan apparently concluded that Beck's claim should not exceed a certain value.  For example, Metropolitan's own adjuster and its retained consultant, Andrew McCabe of McBride Construction, produced successively higher RCV and ACV estimates for Beck's home.  Notwithstanding those estimates, Metropolitan never offered to pay Beck more than the $347,786.34 payment it tendered to Beck on February 29, 2012 – a payment it tendered after it received three higher estimates, including the retained consultant's $520,144.44 estimate.  Subsequently, a second Metropolitan adjuster produced a $428,040.20 estimate, yet Metropolitan never increased its payment to Beck.  It is telling that Metropolitan admitted in its answer its employees produced these higher estimates (ECF No. 8, at 2-4), and that McCabe testified at trial that Metropolitan required him to reduce his initial $520,144.44 by more than $100,000, even though he believed his initial estimate correctly and accurately reflected the cost

to repair and replace the damage to Beck's home within the Policy's terms.  (December 8, 2015, Trial Transcript (draft), at 11-12, 16-17, 22-23, 23-24, and 32.)

Ultimately, the tone of the parties' pre-litigation discussions changed decidedly with the February 4, 2013 letter from Metropolitan's litigation counsel, Daniel Thenell, to Beck's attorney, Clarence Greenwood.  Thenell's three-page letter struck a challenging posture, disputed virtually every point Greenwood raised in his previous letter, and was condescending and arrogant throughout. (ECF No. 67-5.)  In short, Thenell's letter made clear that further negotiations would be on Metropolitan's unilaterally established terms, thus effectively terminating the parties' negotiations.

Accordingly, this factor weighs in favor of an award.

B.    ORS § 20.075(1)(b):  The objective reasonableness of the claims and defenses asserted by the parties.

Beck asserted a single reasonable claim in this case, breach of contract.  She alleged Metropolitan breached the Policy by failing to pay her the correct ACV and RCV of her home.  The record of the pre-litigation estimates from Metropolitan's own adjusters and independent consultant, all of whom produced estimates higher than the February 29, 2012 payment Metropolitan actually tendered to Beck, objectively supported Beck's claim in the lawsuit.  Even had those estimates never been produced, the record demonstrates that Beck's dispute with Metropolitan over the repair value of her home stemmed from her good-faith belief that Metropolitan had not properly valued the damage to her home.

Metropolitan asserted unreasonable defenses in its answer, and during the lawsuit advanced unreasonable arguments to use as the equivalent of defenses.  First, Metropolitan's original answer asserted four affirmative defenses:  failure to state a claim, failure to comply with contractual

obligations, no breach, and failure to meet a condition precedent.  (ECF No. 8, at 5-6.) Metropolitan's failure to state a claim defense was facially meritless because, clearly, Beck's complaint stated a claim for breach of contract.  Notably, Metropolitan never filed a motion to dismiss for failure to state a claim.

Metropolitan based its defenses of failure to comply with contractual obligations and failure to meet a condition precedent on both of two of Beck's alleged failures to comply with her obligations under the Policy:  "1.  Cooperating with Defendant's investigation of the claim; 2. Completion of repair within one year of the date of the actual cash value payment." (ECF No. 8, at 5-6.)  The pre-litigation record unequivocally refutes Metropolitan's claim that Beck failed to cooperate with Metropolitan's investigation of her claim; in fact, the record proves the opposite. Beck never denied Metropolitan's adjustors or retained consultant access to her home after the fire, and throughout the 14-month claims process her attorney consistently communicated with and provided information to Metropolitan about Beck's claims.  Again, it is telling that Metropolitan never moved for summary judgment on this defense.

Metropolitan's "failure to repair or rebuild" defense was similarly without merit, because the record established that Metropolitan tendered to Beck an ACV payment that fell below all the estimates its representatives produced after Lawson's initial January 9, 2012 estimate.  In fact, two of those subsequent estimates put cost of repair at almost $100,000 and $200,000 more than Metropolitan's February 29, 2012 ACV payment to Beck.  Under the Policy, until Metropolitan paid the correct ACV, Beck's obligation to repair or rebuild her home never arose.  On this defense Metropolitan moved (ECF No. 104) for summary judgment; the court denied Metropolitan's motion and instead granted summary judgment for Beck, finding as a matter of law that Metropolitan failed

to pay her the proper ACV under the Policy.  (ECF No. 114.)

On July 16, 2014, 14 months after Beck filed her lawsuit, Metropolitan moved (ECF No. 54) to amend its answer to add seven additional affirmative defenses to its answer.  The specific defenses were "Express/Implied Agency Authority", "Enforceable Agreement", "Breach as to Agreement Regarding Scope of Repairs", "No Breach", "Estoppel", "Unclean Hands", and "Failure to Mitigate". (ECF No. 54, at 4-6; ECF No. 55-1, at 6-7.)  Metropolitan sought to add these affirmative defenses based on its theory that in August 2012 at a meeting with Funk during the pre-litigation claims process, Shook acted as Beck's purported agent and agreed to a settlement of Beck's claim.  (ECF No. 54, at 4-6; ECF No 76-1 (Transcript of July 30, 2014 hearing), at 6.)  Metropolitan filed its motion to amend after the court, a month earlier on June 16, 2014, had granted (ECF No. 45) Beck's motions (ECF Nos. 22 and 25) to quash Metropolitan's deposition subpoenas to Greenwood and Shook.  In granting Beck's motions, the court explicitly ruled that Metropolitan could not depose either Greenwood or Shook about their respective communications with Metropolitan's representatives because those communications occurred in the context of settlement discussions. (ECF No. 45.)

Important context here are the court's oral rulings at the motions to quash hearing.  The court explicitly stated:

> It is clear to me from the information I have available to me that Mr. Shook's assessment that was given to Met Life prior to the August 28, 29 meeting, and that the August 28, 29 meeting were in the context of settlement negotiations to resolve the discrepancies between what the plaintiff believed she was entitled to and what the defendant believed the plaintiff was entitled to.
>
> For those reasons, I'm going to quash the deposition subpoena issued to Mr. Shook as well.  Both subpoenas are quashed.

AMENDED OPINION AND ORDER - 29

> To the extent that the subpoenas requested file materials from either/or both Mr. Greenwood and Mr. Shook, it is quashed. *And to be clear, to make sure we don't have a repeat visit here, no discovery on the documents or information held by Mr. Greenwood or Mr. Shook is to be attempted.*

(Transcript of June 16, 2014 hearing (ECF No. 57), at 32 (emphasis added).)  The court made this ruling after having read during the hearing Beck's attorneys' March 2, 2012 engagement letter to Shook, and announcing to counsel its conclusion that "[i]t is clear to me from the engagement letter that Mr. Shook was hired in anticipation of litigation." (*Id*. at 31-32.)

Metropolitan's new argument turned on purported admissions Beck's attorney contained in her motion to quash reply brief and made in arguments at the hearing on those motions. Metropolitan contended:  "Plaintiff has now confirmed – and represented to the Court – that Mr. Shook was not only retained as a non-testifying expert witness in anticipation for litigation and to facilitate in settlement, but to act on her behalf and agree to a scope of repairs[.]" (ECF No. 54, at 3.) Metropolitan argued these "admissions" acknowledged Shook's "agency relationship" with Beck and, thus, his legal capacity to bind Beck. (*Id.*, at 6.)

The court denied Metropolitan's motion as untimely, because Metropolitan relied on events known to it two years earlier, and because the record contradicted Metropolitan's contention that a settlement had occurred. (ECF No. 76-1 (Transcript of July 30, 2014 hearing), at 13-14; ECF No. 86, at 2, 12-14.)  First, Metropolitan's untimely attempt to amend relied on no new evidence but depended entirely on facts known to it two years earlier. (ECF No. 76-1, at 6-8.)  Second, the argument had no factual support in the record, as this exchange between the court and Metropolitan's counsel at the hearing demonstrates:

> THE COURT:  So let's – well, now, wait.  All you have are two experts who look at a site – and now I'm assuming the facts in the light most favorable to your

position – two experts who meet at the site and agree, yeah, this looks pretty good. What I don't see – the step that is missing in the analysis is where in the record there is any evidence Mr. Shook was the authorized agent of Ms. Beck to bind her to a resolution of her claim against the insurance company?

([Metropolitan's] Counsel reviews the documents)

THE COURT:  I have to say, and I want to say this on the record, the fact that it is taking you so long to find an answer to my question is very telling, because the answer's pretty clear to me.  There is nothing in the record.  And if there was, I would have seen it.  This case – the record of this case bears witness that counsel for the defendant certainly knows how to file motions, brief them, and provide affidavits in support.  There is not one thing in this record from any witness on behalf of the defendant that suggests, let alone directly states, that Mr. Shook was the authorized agent of Ms. Beck for purposes of reaching a settlement agreement.  And there is nothing that says Mr. Funk had that authority on behalf of Met Life.

. . . And all of the correspondence that follows makes it clear that, in fact, that meeting was not for that purpose.  The best you can say is that two experts met to try to reach agreement so that their respective principals could then decide whether to accept or reject what might be a jointly proposed scope of work, and it's clear it was not accepted by Ms. Beck.

So not only do you not – not only does the record not support that a settlement was reached at that time, there is nothing in the record to suggest that Mr. Shook had any authority, apparent or actual, to reach a settlement of this insurance dispute.  There isn't. . . .

(ECF No. 76-1, at 9-11.)  The court denied (ECF No. 86) Metropolitan's motion to amend its answer to add the settlement-based affirmative defenses.

In addition, Metropolitan made arguments in apparent attempts to create defenses against Beck's breach of contract claim, but which were entirely irrelevant to that claim.  On July 3, 2014, Beck filed a motion (ECF No. 49) for protective order, seeking to quash Metropolitan's subpoenas for Beck's account statements from the two banks which held Beck's home mortgages, and to prohibit further inquiry into Beck's financial affairs.  (*Id*. at 2.)  In her motion Beck stated the issue succinctly:

AMENDED OPINION AND ORDER - 31

At trial, Mrs. Beck will present evidence that she is owed a certain amount under her policy with Met P&C; Met P&C will present evidence she is owed less. Her mortgage accounts have nothing to do with resolving this conflict. Nor does her estate plan, which Met P&C requested Mrs. Beck provide during her deposition."

(ECF No. 49, at 5.) In response, Metropolitan argued:

Defendant in this action believes and asserts that Plaintiff's claim for losses is inflated. Defendant intends to put forth at trial credible evidence that Plaintiff has a financial motive to inflate and misrepresent her insurance claim. The question before the factfinder in this action is not simply, as Plaintiff contends, a battle of the experts. Rather the question is whether or not Defendant breached the contract of insurance. Defendant challenges Plaintiff's contention of breach and will argue, in part, that the claim for losses is inflated and the inflation is driven by financial motivation of the Plaintiff and her family.

(ECF No. 52, at 3.)

Metropolitan's argument overlooked the record of the parties' pre-litigation discussions, the evidence gathered during the litigation, and common sense. First and most importantly, Metropolitan completely ignored that Beck's breach-of-contract claim involved as an element no subjective intent or motive, either as part of her claim or as part of any defense Metropolitan included in its answer or had attempted to add by amendment. Second, nothing in the voluminous record of the parties' discussions during the pre-litigation claims process demonstrated or suggested Beck ever misrepresented or inflated the value of any item of damage for which she sought payment, and Metropolitan never presented any such evidence. The court granted (ECF No. 62) Beck's motion for protective order.

Metropolitan also asserted a "fraud" argument, contending that Beck never intended to repair or rebuild her house, but this argument was mertiless. First, Metropolitan never demonstrated how this alleged intention on Beck's part relieved it from the obligation under the Policy to pay her for a covered loss. Second, nothing in the Policy precluded Beck from using Metropolitan's payment

AMENDED OPINION AND ORDER - 32

for a purpose other than repairing or rebuiling her house; if Beck chose to use the insurance proceeds for another purpose, she could, and Metropolitan never pointed to any provision in the policy that prohibited Beck from using the insurance proceeds for another purpose.

Finally, Metropolitan asserted its "matching" argument through a motion in limine (ECF No. 155, at 10) shortly before trial in an attempt to limit, as a matter of law, Beck's recovery for certain damaged items.  Devoting a mere two-thirds of page in its motion in limine to a significant and material question of contract interpretation, Metropolitan argued that Beck should not be permitted to recover for any amounts for items, such as roof shingles, not actually damaged but nonetheless replaced to ensure consistency, or "matching," with replaced items.  Presenting such a significant theory through a motion in limine one month before trial, and without any supporting authority, was facially unreasonable – as was Metropolitan's pronouncement, a month after it filed its motions in limine and four days before the scheduled start date for trial, that it intended to "supply[] . . . additional authority on matching."  This argument was facially unreasonable.

Accordingly, this factor weighs in favor of an award.

*C. ORS § 20.075(1)(c):  Extent to which an award of attorney fees would deter others from asserting good faith claims or defenses in similar cases.*

As the two preceding sections demonstrate, Beck brought her claim in good faith – a fact Metropolitan concedes – and almost all of Metropolitan's defenses and arguments either were without merit or were irrelevant to the single issue to be decided.  Thus, an award of attorney fees in this case would encourage not deter good faith claims and would properly deter defenses not brought in good faith.  Accordingly, a fee award here thus would be consistent with the purpose of the statute.

AMENDED OPINION AND ORDER - 33

This factor weighs in favor of an attorney fee award.

*D. ORS § 20.075(1)(d):  Extent to which an award of attorney fees would deter others from asserting meritless claims and defenses.*

The court's immediately preceding discussion of the subsection (1)(c) factor applies here with equal relevance.  Metropolitan argues its "defenses are not meritless or frivolous."  (ECF No. 213, at 10.)  There is an important distinction to be made here between the merit of Metropolitan's disagreement over the amount of ACV and RCV Beck should recover under the Policy and the merit of defenses and arguments it asserted – many repeatedly asserted – during the case.  The record supports that the parties legitimately disputed the amount Metropolitan should pay Beck for the ACV and RCV under the Policy.  The record does not support, however, the merits of Metropolitan's defenses and arguments it asserted and which the court described above in applying subsection (1)(b) to this case.  As the facts set forth in the "Background" section above make clear, throughout this case Metropolitan continued to assert arguments the court had rejected, advanced theories not supported by competent authority, and attempted to develop facts during discovery to support arguments and defenses irrelevant to the issues in the case.  An award of fees in this case thus will deter other insurers from asserting meritless defenses and arguments.

*E. ORS § 20.075(1)(e):  Objective reasonableness of parties and diligence of parties and their attorneys during the proceedings.*

Metropolitan took an unreasonable approach to defending against Beck's claim.  As the court observed , Metropolitan frequently reargued, "sometimes more than once, virtually every procedural, discovery, and substantive ruling the court has made in this case."  (ECF No. 185, at 1.)  In this relatively simple case disputing only the cost to repair or rebuild Beck's home, Metropolitan's ligation conduct unnecessarily increased the cost of litigating Beck's claim.  Metropolitan attempted

to involve Beck's non-testifying expert[9] and her children in the litigation, engaged in irrelevant discovery, filed motions without basis in law or fact, and sought to relitigate – whether or not styled as a motion for reconsideration – almost every ruling on which it did not prevail.  Metropolitan's conduct forced Beck to file motions to quash subpoenas and respond to these various motions, increasing the length and expense of this lawsuit.

Metropolitan's expert observes that "There have been references to multiple motions for reconsideration, but, in reviewing the record, I only find one motion for reconsideration which seems to have been respectfully submitted to the court for good faith reasons." (ECF No. 215, at 21.)  This observation misunderstands the record, as it appears to rely on the titles of pleadings filed in the docket instead of the content of those filings.  For example, Metropolitan tried four times to obtain, introduce, or use evidence of the settlement discussions between the parties after the court had early on ruled that such evidence was not relevant, though Metropolitan styled only one of those four attempts as "reconsideration."  After the court granted (ECF No. 45) Beck's motions to quash the subpoenas to Greenwood and Shook (ECF Nos. 22, and 25 and 29, respectively), and stating on the record that "no further discovery of materials or information in the possession of Clarence Greenwood or Harry Shook will be allowed" (ECF No. 45), Metropolitan filed: 1) a Motion (ECF No. 54) to Amend Answer and Affirmative Defenses, seeking to add affirmative defenses based on the parties' settlement discussions; 2) a Motion (ECF No. 63) for Reconsideration of Discovery

---

[9]  Metropolitan argues that it was reasonable to pursue non-testifying expert Harry Shook as an available witness "in the event plaintiff called him at the last minute" because the court did not permit counsel to discuss Mr. Shook's involvement in the case or submit any evidence at trial related to Mr. Shook.  (ECF No. 213, at 13-14.)  As Beck made no indication of any intent to call Mr. Shook at trial, the court rejects this argument.

Ruling, claiming "new evidence" justified a deposition of Beck's expert; 3) a Motion (ECF No. 77) to Compel by which it sought leave to depose Beck's children "regarding their conversations with Plaintiff's non-testifying expert Harry Shook"; and 4) pretrial documents that listed exhibits and identified witnesses pertaining to the parties' settlement negotiations.  Beck responded to each of these attempts.  This series of filings is only one example of how Metropolitan's litigation approach increased the cost to litigate Beck's claim.

At the trial phase of this case, Metropolitan listed as exhibit documents and described witness testimony pertaining to subjects that the court previously excluded as beyond the scope of discovery. Metropolitan's only explanation for proposing to use this evidence was that the court had found them to be not discoverable but had not ruled on their admissibility.  No one reading the court's rulings on these subjects could reasonably conclude any of the excluded evidence was admissible.  In short, none of the court's rulings or comments dissuaded Metropolitan from continuing to pursue its litigation strategy even when those rulings and comments made manifestly clear the irrelevance of Metropolitan's arguments and theories.

For these reasons, this factor weighs in favor of a fee award.

*F.  ORS § 20.075(1)(f):  Objective reasonableness of the parties and the diligence of the parties in pursuing settlement of the dispute.*

In her reply (ECF No. 217, at 13-16), Beck recounts in detail the history of the parties' settlement negotiations, a history which the court recognizes as relevant to this factor.  Throughout the claims process the parties disputed the value of the damage to Beck's home, and several months after the loss Metropolitan tendered to Beck a payment for her claim significantly less than either of two estimates Metropolitan's own representatives already had prepared.  The claims process here

AMENDED OPINION AND ORDER - 36

arguably stayed within the range of legitimate, if contentious, disagreement over the amount due under the policy. But once Beck filed her lawsuit, Metropolitan Metropolitan ultimately chose to vigorously litigate every possible aspect of a claim for which it had accepted coverage under the Policy, as though it were an insurance fraud claim. At no time during the lawsuit did Metropolitan assert a coverage or policy defense to Beck's claim, argue Beck caused or contributed to the loss for which she made her claim, or present evidence, credible or otherwise, that Beck misrepresented the value of her claim. In short, Metropolitan never justified its litigation approach in the context of the record or its failure to settle the case once the lawsuit began.

In contrast, Beck's conduct was consistently reasonable, both in pursuing settlement during the lawsuit while advancing her claim simply and directly, based on the Policy.

This factor therefore weighs in favor of the requested award.

*G. ORS § 20.075(1)(g): The amount the court has awarded as a prevailing party fee under ORS § 20.190.*

The parties agree that this factor does not apply here.

*H. ORS § 20.075(1)(h): Such other factors as the court may consider appropriate under the circumstances of the case.*

Beck urges the court to consider as an "other factor" that Metropolitan's counsel left its list of exhibits, which included mention of exhibits previously ruled inadmissible, in a binder to be sent to the jury. (*See* ECF No. 206 pp. 4 (affidavit stating that Metropolitan's exhibit list included references to inadmissible settlement negotiations and inadmissible evidence regarding the "agreed scope" of the estimates on Beck's home).) Beck alleges that Metropolitan's exhibit list was placed in the binder with intent to "purposefully cause a mistrial." Although not as unequivocally as it might have done, Metropolitan contests Beck's characterization that it included the list for the

AMENDED OPINION AND ORDER - 37

purpose of causing a mistrial.

The court concludes this is not a factor it can consider in determining the fee to be awarded in the case. It is true that at the end of trial the court explicitly directed the lawyers for each party to review their respective exhibit binders and remove those exhibits that had been excluded or not used, and to remove any exhibit list, so as to avoid a later claim of mistrial. Metropolitan's lawyers failed to remove its list, which fact they do not contest, but the record does not support Beck's charge that their failure was deliberate or for the purpose of causing a mistrial. The court notes that the error was caught by Beck's counsel, who reviewed Metropolitan's exhibit binder before the exhibits were submitted to the jury – a review the court instructed the lawyers to undertake to ensure compliance with the court's instructions. That Metropolitan would intentionally leave in its binder excluded exhibits or its exhibit list knowing Beck's lawyer would review its binder suggests mistake more than it suggests malice on this point. Thus, this factor does not apply here.

III.    OR. REV. STAT. § 20.075(2) Factors.

   *A.  ORS § 20.075(2)(a):  The time and labor required in the proceeding, the novelty and difficulty of the questions involved in the proceeding, and the skill needed to properly perform the legal services.*

This case involved knowledge of insurance law and construction issues, and skill and experience in this area, as Beck's attorney possessed, were valuable assets. The case involved only the issue of determining the value of Beck's claim, but Metropolitan's decision to "treat[] plaintiff as if there was insurance fraud" (Greene Declaration (ECF No. 209), at 4) greatly increased the amount of time Beck's lawyers had to invest in the case. Also relevant to this factor are the court's previous discussions of the ORS § 20.075(1)(b) and (e) factors. Thus, this factor weighs in favor of an award.

AMENDED OPINION AND ORDER - 38

*B.  ORS § 20.075(2)(b):  The likelihood, if apparent to the client, that the acceptance of the particular employment by the attorney would preclude the attorney from taking other cases.*

Metropolitan is correct that the subsection's language clearly contemplates a prospective assessment, not one informed by hindsight, but this case presents two separate points in time from which the statute's prospective assessment should be applied.  The first time point occurred in January 4, 2012, when Beck contacted Greenwood to hire him to assist her in making her claim under the Policy.  At that time, nothing about her claim suggested that her attorneys would need to forego other work to represent her in what appeared to be a simple property loss claim.

The parties' course of dealing in the 14 months that followed and culminating with Beck's lawyers' receipt of the February 4, 2013 Thenell letter, however, revealed to Beck that resolving her claim would not be as straightforward as she initially might have assumed.  Thus, by the second time point, May 2013 when Beck filed her lawsuit against Metropolitan, Beck had reason to believe her lawyers could be required to forego other work to pursue her claim in litigation.  Accordingly, the court gives some weight to this factor in determining the fee to award.

*C.  ORS § 20.075(2)(c):  The fee customarily charged in the locality for similar legal services.*

A reasonable hourly rate is determined by looking to the "prevailing market rates in the relevant community" as well as the skill, experience, and reputation of the lawyer.  *Blum v. Stenson*, 465 U.S. 886, 895 (1984); *United States v. $28,000 in U.S. Currency,* 802 F.3d 1100, 1105 (9th Cir. 2015); *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1205 (9th Cir. 2013).  The party requesting fees has the burden of producing "satisfactory evidence," in addition to the affidavits of its counsel, that the requested rates are in step with those "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation."  *Dang v. Cross*, 422 F.3d

800,814 (9th Cir. 2005) (quoting *Blum*, 465 U.S. at 895 n.11).  The best evidence of the prevailing

rate in Oregon is the periodic Economic Survey conducted by the Oregon State Bar.  LR 54-3;

*Roberts v. Interstate Distrib. Co.*, 242 F. Supp. 2d 850, 857 (D. Or. 2002); *Arnold v. Pfizer, Inc.*,

3:10-cv-01025-AC, 2015 WL 4603326, *1 (D. Or. July 29, 2015).[10]

 Beck submitted expert evidence in the form of declarations from attorneys Michael Greene

(ECF No. 209) and Michael Farnell (ECF Nos. 208, 220), and declarations from her own attorneys,

Margaret Schroeder (ECF Nos. 206, 218), and Michael Merchant (ECF No. 219), as expert evidence

of her attorneys' skill and experience in insurance law, and also to support the hourly rates she

requests for her attorneys.  Based on this evidence, the court concludes that Black Helterline LLP's

hourly rates are within the reasonable range of hours for Portland attorneys in private practice with

similar experience, consistent with the OSB Economic Survey.  Accordingly, the court accepts the

following hourly rates for Beck's attorneys:

| | |
|---|---|
| Charles H. Greenwood: | $375 (2012); $385 (2013); $395 (2014); $405 (2015) |
| Andrew T. Reilly: | $310 (2012); $315 (2013); $325/$330 (2014); $345 (2016) |
| Margaret E. Schroeder: | $290 (2014); $300 (2015); $320 (2016) |
| Michael B. Merchant: | $375 (2014-2015); $400 (2016) |
| Britta E. Warren: | $230 |
| Matthew D. Colley: | $180 (2014); $190 (2015); $210 (2016) |

---

 [10]  To the extent that Beck relies on the Morones Survey to establish a reasonable hourly rate, the court rejects that survey as proper evidence of the prevailing market rate.  *See Sturgis v. Asset Acceptance, LLC*, Civ. No. 3:15-cv-00122-AC, 2016 WL 3769750, *2-*4 (D. Or. July 14, 2016) (finding that "[t]he Morones Survey does not meet the Ninth Circuit's or this district's requirements to serve as evidence of prevailing market rates.").

Alexander A. Wheatley:          $190 (2013); $195 (2014)

Caitlin M. Wong:                $180 (2014)

This factor thus weighs in favor of the requested award.

*D. ORS § 20.075(2)(d):  The amount involved in the controversy and the results obtained.*

The amount involved was the single issue to be decided in this case, as the parties disputed the value of Beck's home and the cost to repair or rebuild it.  Beck prevailed on this issue to a significant degree.  The jury returned a verdict for Beck of $547,192.63 for the ACV of her home and $596,720.42 for the RCV of her home.  Metropolitan previously had paid Beck $347,786.34. The jury's $547,192.63 ACV award represented a 57.3% increase over the amount Metropolitan had paid, and the $596,720.42 RCV award represented a still greater increase.

In addition, Beck prevailed on every discovery and dispositive motion during the litigation phase of the case.  The results Beck obtained during this phase of the case are as significant as the jury' verdict, because Metropolitan forced Beck to file motions to quash or for protective orders, as well as to respond to motions seeking, sometimes repeatedly, to obtain irrelevant discovery or add defenses based on issues the court had previously resolved.

Metropolitan argues that Beck's verdict fell below the amount of her prayer and, thus, that this factor should not weigh in favor of an award, but Metropolitan's argument overlooks the policy underlying the statute.  "Case law makes clear that the results obtained do not represent some upper limit on the fee recovery, nor is the fee recovery necessarily limited to the work done on the claims that resulted in recovery." *Axis Surplus Ins. Co. v. Lebanon Hardboard, LLC*, Case No. 07-cv-292-MO, 2009 WL 490008, at *6 (D. Or. Feb. 26, 2009), citing *Hartford v. Aetna/Mt. Hood Radio*, 270 Or. 226, 527 P.2d 406 (1974).  "The idea is to allow those who bring relatively small claims to

AMENDED OPINION AND ORDER - 41

obtain the entire amount of the fees expended, so that insurers cannot simply make such claims too expensive to be worth pursuing." *Axis Surplus Ins. Co.*, 2009 WL 490008, at *6, citing *Barbara Parmenter Living Trust v. Lemon*, 345 Or. 334, 194 P.3d 796 (2008). Although the instant case does not involve a "relatively small claim," this policy of discouraging insurers from making claims too expensive to pursue applies with equal force here.

Accordingly, this factor weighs in favor of the requested award.

*E. ORS § 20.075(2)(e): The time limitations imposed by the client or the circumstances of the case.*

This factor weighs somewhat in favor of Beck's motion. At the time she filed her claim, Beck was 85 years old; she is now over 90 years old. Beck's advanced age may have contributed to both her and her lawyers' desire to resolve her claim quickly, but obtaining a speedy resolution of a case is a goal shared by most litigants and, thus, is not a factor entirely unique to this case.

*F. ORS § 20.075(2)(f): The nature and length of the attorney's professional relationship with the client.*

This factor weighs neither for or against an award. Beck, the widow of a former partner of the Black Helterline law firm, has been represented by the firm since her husband's death in 1989. This long-standing professional relationship would give her lawyers a level of familiarity with her business and legal affairs. However, it does not follow that this relationship would provide her lawyers with information relevant to her claim under the Policy, beyond the general knowledge that Beck owns a home, its address, and its assessed value. Information regarding the cost to repair or rebuild, as demonstrated by the expert's assessments and the voluminous exchange of information during the settlement negotiations, is considerably more detailed and specific than Beck's lawyers would be expected to know by virtue of a long-standing attorney-client relationship.

AMENDED OPINION AND ORDER - 42

*G. ORS § 20.075(2)(g):  The experience, reputation and ability of the attorney performing the service.*

Beck's counsel Margaret Schroeder, an advocate with over 13 years' experience, was consistently successful during motion practice and successfully tried this case to a jury while opposed by two experienced insurance defense attorneys.  Ms. Schroeder received assistance from other lawyers in her firm who also had varying degrees of experience in the insurance coverage disputes.  This factor therefore weighs in favor of an award.

*H. ORS § 20.075(2)(h):  Whether the fee is fixed or contingent.*

This factor weighs in favor of an award.  Beck's attorneys initially worked under an hourly fee agreement.  That fee arrangement changed to a contingency fee agreement because Beck became unable to pay her lawyers on an hourly basis as the litigation progressed.  Thus, from that point forward Beck's attorneys undertook a risk of not being fully compensated for their time on the case.  Although the court's summary judgment ruling (ECF No. 114) in July 2015 found Metropolitan had breached the Policy and Beck entitled under ORS § 742.061 to recover her attorney fees, this ruling did not necessarily reduce this risk.  Metropolitan undertook a strategy throughout this case of contesting or raising every possible issue, whether repeatedly ignoring the court's ruling barring use of the parties' settlement discussions, raising issues, such as "matching," on the eve of trial and without any supporting authority, or relitigating rulings, such as the proof-of-loss issue in connection with the current motion, the court had already decided.  Metropolitan's litigation strategy increased the risk to Beck's attorneys that they might not be fully compensated for their time.  Accordingly, this factor weighs in Beck's favor.

In sum, the ORS § 20.075(2) factors considered here weigh in favor of the requested award.

AMENDED OPINION AND ORDER - 43

IV.    Multiplier

Beck asks the court to apply a multiplier of 2.0 to her requested attorney fees of $597,699.25, for a total of $1,195,398.50, due to the nature of this case and the conduct of Metropolitan and its counsel.    Oregon law permits an enhancement of fees when it is supported by the facts and circumstances of the case.  *See Griffin v. TriMet*, 112 Or. App. 575, 585 (1992) *aff'd in part and rev'd in part,* 318 Or. 500 (1994) (approving trial court award of 2.0 multiplier).  Federal courts apply attorney fee multipliers based on state law.  *Mangold v. California Pub. Utils. Comm'n*, 67 F.3d 1470 (9th Cir. 1996) (approving trial court's award of 2.0 multiplier).

Metropolitan argues that a multiplier is not warranted in this case because (1) relevant case law does not support use of a multiplier; (2) Beck mischaracterizes Metropolitan's conduct and the court's filings in this matter; and (3) Beck's change from hourly to contingency billing resulted in a lesser risk for her lawyers.

The facts and circumstances contained in the "Background" section, above, and the record as whole, firmly support the application of a multiplier, and some of those events are appropriate to highlight here.  Three months after the December 2011 loss, Metropolitan paid Beck an amount for her loss lower than either of the two estimates its own representatives previously had prepared.  During the lawsuit, Metropolitan never explained its reasons for refusing to offer Beck an amount equal to either of those estimates.  Metropolitan – despite accepting coverage for Beck's claim – litigated the case "as if there was insurance fraud" (Greene Declaration (ECF No. 209), at 4), even though at no point during the claim process or the lawsuit did it raise any such defense.  Metropolitan also attempted to obtain irrelevant evidence, such as Beck's financial statements and estate planning records, using as justification a theory that lacked any relevance to determining the amount to repair

AMENDED OPINION AND ORDER - 44

or rebuild Beck's home – the only question to be decided in the lawsuit.  And Metropolitan raised

substantive policy interpretation issues, such as "matching" and Coverage A Plus, for the first time

in pretrial documents, despite having ample opportunity to raise these material issues during the

eighteen months the case had been pending.  Metropolitan's disorganized or deliberately untimely

approach to raising these issues caused Beck to incur fees for having to respond both to the substance

of the issues and their procedural infirmity.  Finally, Metropolitan continued this litigation conduct

by rearguing the proof-of-loss issue in opposing Beck's attorney fee motion, which issue the court

decided in its July 2015 summary judgment ruling.  The record bears out that Beck has not

mischaracterized Metropolitan's behavior.

This lawsuit proved more costly than necessary for Beck to litigate because of Metropolitan's

tactics, and use of a multiplier in favor of a plaintiff who prevailed against such tactics is supported

by the case law.  *See, e.g., Price v. Country Preferred Insurance Company*, Case No. 11-08-47250

(Union County case wherein the court awarded a 2.0 multiplier and defendant insurer was

represented by Metropolitan's counsel, who employed similar tactics as described in this case).  On

this point the court observes that Metropolitan attempts to distinguish several cases Beck cites in

which the attorneys there are the same attorneys who represented Metropolitan in this case.

Although the conduct of Metropolitan and its attorneys in this case stands on its own to justify

application of a multiplier, the cases Becks cites confirm that the court's assessment of

Metropolitan's attorneys' conduct here is not in error, but instead is consistent with the assessments

of other courts that encountered the same conduct.  Accordingly, the court finds that application of

a multiplier is warranted, and it concludes that a multiplier of 2.0 is appropriate.

Although a multiplier is appropriate here, the court concludes that it should apply only to the

fees Beck incurred once Metropolitan's litigation appeared on Metropolitan's behalf, a conclusion supported both by the record and by Beck's own arguments. Beck argues that a "multiplier of 2.0 should be applied due to the nature of this case and the conduct of Metropolitan and its counsel." (ECF No. 205, at 18.) She observes that "[h]ere, Metropolitan's counsel employed tactics that warrant a similar multiplier [to that applied in another case]." (ECF No. 205 at 19.) These excerpts are examples of Beck's heavy reliance, evident both in her opening brief in support of her attorney fee motion and in her reply brief, on the conduct of Metropolitan's counsel to support her request for application of a 2.0 multiplier. The court agrees, as explained and supported herein, that a 2.0 multiplier is appropriate to apply to the fees Beck consequently incurred during the litigation.

But Metropolitan's litigation counsel played no role in the parties' negotiations of Beck's claim during the thirteen months between January 4, 2012, the date Beck first contacted her attorneys about her claim, and February 20, 2013, the date on which Beck's lawyers received Metropolitan's litigation counsel's first letter regarding Beck's claim. Beck urges the court also to apply the 2.0 multiplier to the fees she incurred during this time period because "[a]s set forth in the parties' settlement correspondence, Schroeder Decl., Ex. 12, Metropolitan also refused to make any serious attempt at settlement." (ECF No. 205, at 20.) The parties' settlement negotiations were protracted, and no doubt were complicated by the size and complexity of Beck's house. Beck had lived in her house for 56 years (ECF No. 1, at 2) and the evidence at trial showed its construction consisted both of original design features and of various upgrades made at different times during that 56-year period. The record of the parties' discussions during these thirteen months documents the parties' disagreements and reveals Beck's mounting frustration with the process, but it does not support the application of a multiplier to the fees Beck incurred during that time period. Accordingly, the court

concludes that no multiplier should be applied to the fees Beck incurred during this period.

V.    Hours Reasonably Expended.

The court is responsible for determining the reasonableness of a fee petition. *Gates v. Deukmejian*, 987 F.2d 1392, 1398 (9th Cir. 1992). Beck has documented the hours expended on this lawsuit in sufficient detail. The court finds that Beck has not demonstrated that the billing entries related to IRS research and estate tax research were reasonably necessary to the litigation; accordingly the court reduces Beck's award by $3,787.75 to account for the value of those hours. The court also finds that Beck's counsel's expense of over 95 hours in preparation for and attendance of mediation, billed at over $30,000, is excessive. (*See* ECF No. 206-1, at 105-110.) Accordingly the court further reduces Beck's award by $15,000.

Metropolitan argues that Beck's attorneys' fees should be further reduced for activities that involve intra-office conferences between attorneys and for attorneys billing for the same tasks. The Oregon Court of Appeals has found circumstances that warrant awarding fees to conferring attorneys. In *State ex rel. English v. Multnomah Cty.,* 231 Or. App. 286, 299, (2009), the court awarded attorney fees for "conferring periodically so as to coordinate efforts with other attorneys" involved in similar cases, finding such time entries to be reasonable. *Id.* at 299. In *Old W. Fed. Credit Union v. Skillman*, Case No. 2:11-cv-01170-SU, 2012 WL 4594256 (D. Or. Sept. 6, 2012), the court noted that where coordinating tasks was necessary, "telephone conference between . . . two attorneys were essential to effectively and efficiently representing [the] plaintiff." *Id.* at *5 (declining to reduce fees for attorney conferences billed by each attorney because they appeared reasonable under the circumstances). The court has reviewed Beck's fee petition and documentation, and notes that lead attorney Schroeder tried the case alone, attended almost every hearing alone, and

took or defended all depositions by herself.  The court notes that many of the fee entries to which Metropolitan objects are for conferences for which only one attorney billed time.  (*See* ECF No. 214.)  The collaborative sessions of Beck's attorneys documented in the fee petition are reasonable.

In sum, excluding unrelated billing entries and excessive preparation time billed for mediation, Beck has met her burden of demonstrating the number of hours spent was reasonably necessary to the litigation and that counsel made "a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary." *Hensley,* 461 U.S. at 434; *Gonzalez*, 729 F.3d at 1202.

VI.    Attorney Fees Awarded.

Accordingly, the court awards Beck attorney fees as follows:[11]

1.  **$76,542.00**, the amount of fees Beck incurred from January 4, 2012, the date she retained her lawyers, through February 3, 2012, the day before her lawyers received the first letter from Metropolitan's litigation counsel;

2.  **$869,542.00**, which amount represents $453,513.75, the amount of fees Beck incurred from February 4, 2012, the date on which her lawyers received the first letter from Metropolitan's litigation counsel, through December 11, 2015, the date on which the jury returned a verdict in Beck's favor, reduced by $18,787.75 to account for the hours the court found not reasonably expended, for a subtotal of $434,726.00, to which the 2.0 multiplier is applied;

3.  **$82,684.00**, which amount represents $41,342.00, the amount of fees Beck incurred from

---

[11]  Numbered paragraphs 1 and 2 in this list contain the court's corrected calculations of attorney fees during the periods referenced.

AMENDED OPINION AND ORDER - 48

December 14, 2015 through February 12, 2016, to prepare her Motion for Attorney's Fees and Costs, to which the 2.0 multiplier is applied; and

4. **$52,782.00**, which amount represents $26,391.00, the amount of fees Beck incurred from February 15, 2016 through April 8, 2016, to prepare her reply brief to Metropolitan's opposition to her attorney fees motion, to which the 2.0 multiplier is applied.

Therefore, the total attorney fees awarded to Beck is **$1,081,370.50**.

VII.    <u>Recoverable Costs</u>.

Under 28 U.S.C. § 1920:

A judge or clerk of any court of the United States may tax as costs the following:

> (1) Fees of the clerk and marshal;
>
> (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;
>
> (3) Fees and disbursements for printing and witnesses;
>
> (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;
>
> (5) Docket fees under section 1923 of this title;
>
> (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

A bill of costs shall be filed in the case and, upon allowance, included in the judgment or decree.

Costs "should be allowed to the prevailing party." FED. R. CIV. P. 54(d)(1). This rule creates a presumption in favor of awarding costs to the prevailing party. *Association of Mexican-American Educators v. State of California*, 231 F.3d 572, 591 (9th Cir. 2000) (en banc). The district

AMENDED OPINION AND ORDER - 49

court need not specify reasons for its decision to abide the presumption and tax costs to the losing party, but "need only find that the reasons for denying costs are not sufficiently persuasive to overcome the presumption in favor of an award." *Save Our Valley v. Sound Transit*, 335 F.3d 932, 945 (9th Cir. 2003). It is "incumbent upon the losing party to demonstrate why the costs should not be awarded," *Stanley v. Univ. of Southern California*, 178 F.3d 1069, 1079 (9th Cir.1999), and the trial judge has wide discretion in awarding costs under Rule 54(d)(1). *Arboireau v. Adidas Salomon AG*, No. 01-105-ST, 2002 WL 31466564, at *4 (D. Or. June 14, 2002).

Beck requests $10,128.01 for costs in the following categories: complaint filing fee; service of summons, complaint, and subpoenas; witness and mileage fees; deposition transcripts; hearing transcripts; delivery fees; electronic research; discovery CD for digital photos; foam-core trial exhibit; photocopies; postage; and telephone. The court first addressed Metropolitan's contention that Beck has not provided a sufficient breakdown of her costs, then addresses the individual categories of costs for which Beck seeks reimbursement.

### A. Specific and Sufficient Documentation.

Metropolitan argue that Beck has not provided a sufficient breakdown showing which costs are associated with which person and which day, relying on *Frevach Land Co. v. Multnomah Cty.*, No. CV-99-1295-HU, 2001 WL 34039133, at *30-31 (D. Or. Dec. 18, 2001), where the court reduced a cost award for the plaintiff's failure to sufficiently document its costs. *Frevach Land Co.* is inapposite. In *Frevach*, the court noted a "general lack of specificity" in documenting petitioner's fees and costs. *Id.* That is not the case here. Beck's counsel has submitted an affidavit attesting to the costs Beck incurred, supported by detailed documentation totaling 120 pages. *See* Declaration of Margaret E. Schroeder (ECF No. 206), ¶¶ 6-15, and Exhibits 3-11 (ECF Nos. 206-3 through 206

11).  Beck's documentation is sufficiently detailed; thus, the court turns to the individual items for which Beck seeks reimbursement.

 *B.  Filing Fee.*

 A prevailing party may recover "[f]ees of the clerk[.]"  28 U.S.C. § 1920(1).  Beck is the prevailing party in this case, and she is entitled to recover her filing fee.  *See* ECF No. 206-3.

 *C.  Fees for Printed or Electronically Recorded Transcripts Necessarily Obtained for use in the Case.*

  1.  Deposition transcripts.

 "Depositions are 'necessary' if introduced into evidence or used at trial for impeachment or cross-examination."  *Arboireau*, 2002 WL 31466564, at *5.  The cost of a deposition not used at trial still may be recovered "if taking the deposition was reasonable as part of the pretrial preparation of the case rather than merely discovery for the convenience of counsel, or if the deposition was required for a dispositive motion."  *Id*.  The underlying inquiry is whether the depositions reasonably seemed necessary at the time they were taken.  *Manildra Mill. Corp. v. Ogilvie Mills, Inc.*, 76 F.3d 1178, 1184 (Fed. Cir. 1996), citing 10 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE and PROCEDURE § 2676, at 341 (2d ed.1983).  The court has reviewed Beck's supporting documentation (ECF No. 206-6) for the deposition transcript costs incurred and finds reasonable and necessary each deposition taken and deposition transcript copy obtained.

  2.  Transcripts of court proceedings.

 Beck seeks reimbursement for the cost incurred in ordering transcripts of seven (7) court hearings. (ECF No. 206-7.)  Some courts apply a heightened standard of necessity when determining whether the cost of daily trial transcripts should be awarded under Rule 54(2).  *See, e.g., Maris*

*Distributing Co. v. Anheuser-Busch, Inc.*, 302 F.3d 1207, 1225-26 (11th Cir. 2002) (remarking that whether to award the costs of daily transcripts is a "closer question," and stating "we do not believe that the costs associated with expedited trial transcripts should be allowed as a matter of course, lest litigation costs be unnecessarily increased[.]").  The transcripts Beck obtained were made necessary both because of the need to have a record of the court's rulings on the discovery and substantive issues the parties presented during the litigation phase of the case, and by Metropolitan's attempts to relitigate many of the rulings issued at those hearings.  Accordingly, the court finds these costs reasonable and necessary.

   *D.  Fees and Disbursements for Printing and Witnesses.*

    1.  Witness fees.

  A witness is entitled to a fee of $40.00 for each day the witness is testifying.  28 U.S.C. § 1821(b) ("A witness shall be paid an attendance fee of $40 per day for each day's attendance."). Mileage is permitted in addition to this fee.  28 U.S.C. § 1821(c)(2) (providing for a "travel allowance equal to the mileage allowance" paid to federal employees).  *See, e.g., Dimon v. Oregon*, No. 08-6152-HO, 2009 WL 3401048 (D. Or. Oct. 20, 2009) (awarding witness fee and mileage); *Kyei v. Oregon Dept. of Trans.*, No. 07-1607-AC, 2010 WL 935489, at *4 (D. Or. March 11, 2010) (same).  Beck has documented her witness fees.  (*See* ECF No. 206-5.)  The court finds the witness fees reasonable and necessary.

    2.  Printing and copying costs.

  Copying costs for documents produced to opposing parties in discovery, submitted to the court for consideration of motions, and used as exhibits at trial are recoverable.  *Teicher v. Regence Health and Life Ins. Co.*, No. 06-1821-BR, 2008 WL 5071679, at *11 (D. Or. Nov. 24, 2008);

AMENDED OPINION AND ORDER - 52

*Arboireau*, 2002 WL 31466564, at \*6 (citing *Fressell v. AT & T Tech., Inc.*, 103 F.R.D. 111, 115-16

(N.D. Ga. 1984)).  However, recoverable copying costs "do 'not include extra copies of filed papers,

correspondence, and copies of cases since these are prepared for the convenience of the attorneys.'"

*Arboireau*, 2002 WL 31466564, at \*6 (citation omitted).  Recoverable copying costs also do not

include costs associated with in-house photocopying for use by counsel.  *Frederick v. City of

Portland*, 162 F.R.D. 139, 144 (D. Or. 1995).  A party's conclusory assertion that all copies were

reasonably necessary to its case is, by itself, insufficient.  *Kraft v. Arden*, No. 07-487-PK, 2009 WL

73869, at \*9 (D. Or. Jan. 8, 2009).  *See also Arboireau*, 2002 WL 31466564, at \*6 (same).

> Local Rule 54–1(a)(1) describes the requirements for cost bills filed in this district:
>
> Bill of Costs:  Not later than fourteen (14) days after entry of judgment or receipt and docketing of the appellate court's mandate, the prevailing party may file and serve on all parties a Bill of Costs that provides detailed itemization of all claimed costs. The prevailing party must file an affidavit and appropriate documentation.

This rule requires the prevailing party to explain the nature of the photocopying so that the court may

determine which costs, if any, are properly awardable.  *Key Bank Nat'l Ass'n v. Van Noy*, 598 F.

Supp. 2d 1160, 1168 (D. Or. 2009); *Robins v. Scholastic Book Fairs*, 928 F. Supp. 1027, 1035 (D.

Or. 1996).

Beck's request for $823.05 in copying costs (*see* ECF No. 206 ¶ 14) lacks the specificity this

district requires.  Other than stating the total cost of the copies made during the case, her attorney's

affidavit contains no explanation of the purpose for which the copies were made and she provides

no receipts or other documentation that would allow the court to determine whether any of the

incurred cost is recoverable.  Furthermore, the absence of a description of the copies made deprives

Metropolitan from determining to which part of this cost it should object.  For this reason, Beck's

AMENDED OPINION AND ORDER - 53

request for $823.05 in copy costs is denied.

### 3.  Enlarged exhibits.

Beck seeks $50.00 for the cost of a foam-core board mounted exhibit and $26.75 for copies of digital photos her attorney used at trial.  (*See* ECF No. 206 ¶13, and Exhibit 10 thereto.)  This court previously has declined to award costs for enlarged exhibits that were merely large versions of standard-size exhibits previously admitted into evidence at trial.  *See Williamson v. Munsen Paving, LLC*, Case No. 09-736-AC, 2011 WL 723028, at *5-6 (D. Or. Feb. 22, 2011)(refusing prevailing plaintiff's request for the expense of enlarged exhibits); *Hunt v. City of Portland*, Case No. 08-802-AC, 2011 WL 3555772, at *12-*13 (D. Or. Aug. 11, 2011) (denying prevailing defendant's request for the expense of enlarged exhibits).  The cost of the enlarged exhibit is denied.

The court grants Beck's request for the cost incurred to reproduce digital photos.  Beck introduced into evidence numerous photos showing the damage to various areas of her home.  These exhibits were essential to the jury's understanding of the expert testimony both parties presented regarding the extent of damage to Beck's home and the cost to repair the damage.  Thus, this cost is allowed.

### E.  *Legal research costs*.

Beck seeks $184.20 in fee incurred for legal research.  (*See* ECF No. 206 ¶ 12, and Exhibit 9 thereto.)  The Ninth Circuit has held that costs for certain expenses such as electronic legal research, postage, courier services, facsimile charges, and long distance phone charges, are litigation expenses which may be recovered as part of an award of attorney's fees if "it is the prevailing practice in a given community for lawyers to bill those costs separately from their hourly rates." *Trustees of the Constr. Indus. & Laborers Health & Welfare Trust v. Redland Ins. Co.*, 460 F.3d

1253, 1256, 1258-59 (9th Cir. 2006) (noting the "growing circuit consensus" on this issue). Although Beck offers no information regarding the prevailing practice in this community, the court's experience reviewing attorney fees and cost bills allows it to conclude that separately billing legal research costs is sufficiently common in this district to satisfy the Ninth Circuit's test. This cost is allowed.

F. *Postage, telephone charges, service fees, and delivery fees*.

Beck seeks service fees of $914.92, delivery fees of $443.51, postage costs of $110.43, and telephone charges of $100.35. (*See* ECF No. 206 ¶¶ 7, 11, 14, and Exhibits 4 and 9 thereto.) The *Redland Ins. Co.* case, discussed in the preceding subsection, is on point. The court allows these expenses.

G. *Expert expenses*.

Beck also requests an award of $9,397.14 for time spent by Beck's experts responding to Metropolitan's discovery requests, including their depositions. (*See* ECF No. 205, at 17; ECF No. 206 ¶15, and Exhibit 11 thereto.) For support, Beck cites Federal Rule of Civil Procedure 26(b)(4)(E), which reads:

> (E) *Payment.* Unless manifest injustice would result, the court must require that the party seeking discovery:
>
> (i) pay the expert a reasonable fee for time spent in responding to discovery under Rule 26(b)(4)(A) or (D); and
>
> (ii) for discovery under (D), also pay the other party a fair portion of the fees and expenses it reasonably incurred in obtaining the expert's facts and opinions.

"Absent 'express statutory authority' " for shifting expert witness fees, reimbursement for such fees is limited by 28 U.S.C. §1821(b) (setting a $40 per day witness attendance fee and mileage) and §

1920(3) (allowing recovery of "fees and disbursements for . . . witnesses"). *Lovell v. Chandler*, 303 F.3d 1039, 1058 (9th Cir. 2002), quoting *Crawford Fitting Co. v. J.T. Gibbons, Inc.*, 482 U.S. 437, 439 (1987). The ADA is one example of such statutory authority, as it specifically authorizes an award of "litigation expenses," including expert witness fees, to the prevailing party. *Lovell*, 303 F.3d at 1058, citing 42 USC § 12205.

In her opening brief Beck cites only Rule 26(b)(4)(E) as authority for recovering these expenses, without analysis to support that the rule constitutes "statutory authority" for shifting the cost of her experts to Metropolitan. (ECF No. 205, at 17.) Neither Metropolitan's opposition brief (ECF No. 213, at 37) nor Beck's reply brief (ECF No. 217, at 27) add any authority or analysis to the issue. Based both on the record and the controlling case law, the court concludes that Beck is not entitled to recover the cost of her expert witnesses. Thus, this cost is denied.

Accordingly the court concludes that Beck is entitled to recover costs in the amount of $9,254.96.

## Conclusion

For the aforementioned reasons, Beck's Motion for Attorneys' Fees and Costs (ECF No. 205, 207) is GRANTED IN PART AND DENIED IN PART. Beck is awarded attorney fees in the amount of $1,081,370.50 and costs in the amount of $9,254.96.

IT IS SO ORDERED.

DATED this 16th day of September, 2016.

_____   /s/   John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge
